**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 07-20321-CIV-LENARD/TORRES

R.L. and S.L., individually, and on
behalf of O.L., a minor,

       Plaintiffs,

v.

Miami-Dade County School Board,

       Defendant.

_____/

**REPORT AND RECOMMENDATION ON**
**PARTIES' MOTIONS FOR JUDGMENT ON THE RECORD**

       This is an action arising pursuant to the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* appealing a final order of the Honorable Robert E. Meale, Administrative Law Judge ("ALJ") of the State of Florida Division of Administrative Hearings.  Before the Court is Plaintiffs', R.L. and S.L. (the "Parents") individually and on behalf of O.L., a minor, Proposed Order Relating to IDEA Issues ("Parents' Proposed Order") [DE 21, Attach. 1], filed January 11, 2008.  Defendant Miami-Dade County School Board (the "Board") filed its own Motion for Judgment on the Record ("Board's Motion") [DE 23, 24, 25], on January 11, 2008. The Parents filed a Response to the Board's Motion ("Parents' Response") [DE 29] on January 22, 2008.  The Board filed a Consolidated Response to the Parents' Proposed Order and to the Parents' Response ("Board's Consolidated Response") [DE 34] on February 14, 2008.  The Parents filed a Reply to the Board's Consolidated Response ("Parents' Consolidated Reply") [DE 35] on February 21, 2008.  Upon thorough consideration of the entire record and the written arguments of the Parents' and the Board, the parties' motions should be Granted in Part and Denied in Part and the case Remanded in accordance with the Court's findings.

## TABLE OF CONTENTS

I.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.     Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         1.     Overview of O.L.'s Disability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

         2.     O.L.'s Educational History Prior to High School. . . . . . . . . . . . . . . . 4

         3.     Individualized Educational Plan ("IEP")
              Planning Process and Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         4.     O.L.'s IEP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         5.     O.L.'s Experience at PSHS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         6.     Professional Witnesses' Recommendations. . . . . . . . . . . . . . . . . . . 15

    B.     Administrative Law Judge's Findings. . . . . . . . . . . . . . . . . . . . . . . . . 22

II.     THE APPLICABLE LAW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.     Individuals with Disabilities Education Act. . . . . . . . . . . . . . . . . . . . . . 23

    B.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C.     Summary Judgment Standard in IDEA Cases. . . . . . . . . . . . . . . . . . . . 30

III.     ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    A.     Overview of Issues in Dispute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    B.     Review of Procedural Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

         1.     Educational Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

         2.     Requests for Prior Written Notices ("PWN"). . . . . . . . . . . . . . . . . . 37

         3.     Predetermination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

         4.     Parental Participation and Input. . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    C.     Substantive Review of School Setting Determination. . . . . . . . . . . . . . 48

         1.     MAST Academy Setting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

         2.     Placement at PSHS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

         3.     Least Restrictive Environment ("LRE"). . . . . . . . . . . . . . . . . . . . . . 60

IV.     CONCLUSION AND RECOMMENDATION. . . . . . . . . . . . . . . . . . . . . . . . . . 62

# I. BACKGROUND

## A. *Findings of Fact*

### 1. *Overview of O.L.'s Disability*

O.L., born on November 4, 1991, has a combination of neurological, digestive, emotional, and behavioral symptoms.  [Final Order, Jan. 8, 2007 ("FO"), ¶ 1].  He has been diagnosed with Asperger's Disorder, pervasive developmental disorder,[1] attention deficit hyperactivity disorder ("ADHD"),[2] and gastroesophagael reflux disease ("GERD").  [FO ¶¶ 3, 15].  Persons with Asperger's Disorder typically display a qualitative impairment in social interaction, patterns of restrictive behaviors, interests and activities, and communication difficulties.  [FO ¶ 4].  Adolescents with Asperger's Disorder may also display separate disorders, most frequently anxiety and depression, and may suffer from obsessive-compulsive disorder.  [FO ¶ 5].  Additionally, adolescents diagnosed with autism undergo sensory challenges in managing aspects of their physical environment, which may arise from visual, auditory, olfactory, gustatory, or physical stimulation.  [FO ¶ 6].  An adolescent patient's response to overstimulation may range from shutting down to physical aggression and may be immediate or delayed, such as after leaving a stressful environment and returning home. [FO ¶¶ 6, 35].  Sensory overload or anxiety may produce fatigue, headaches, stomach aches, and vomiting.  [FO ¶ 7].

O.L.'s medical history is extensive.  Various physicians have prescribed medications to stabilize O.L.'s mood, reduce his anxiety, treat his ADHD, and treat his digestive disorders. [FO ¶ 8].  His treating physicians include: Dr. Roberto Tuchman ("Dr. Tuchman"), a

---

[1]Pervasive developmental disorder, or autism spectrum disorder, describes the spectrum of disorders of which Asperger's Disorder is a part of.  [FO ¶ 4].

[2]It is not possible to diagnose differentially ADHD in persons with autism, but adolescents with Asperger's Disorder are treated for ADHD symptoms.  [FO ¶ 5].

neurologist treating O.L.'s neurological symptoms and prescribing psychotropic medications; Dr. William Munoz ("Dr. Munoz"), a pediatric gastroenterologist treating O.L.'s GERD; Dr. Carlos Gonzalez ("Dr. Gonzalez"), a Board-certified psychiatrist managing O.L.'s medications; and Dr. Lani Kaskel ("Dr. Kaskel"), a licensed school psychologist treating O.L. using behavior modification. [FO ¶¶ 11, 15, 22, 70]. O.L.'s multiple symptoms present a challenge to treating physicians, including with respect to the medication prescribed, because his neurological status may exacerbate his complex of symptoms. [FO ¶ 9]. In other words, the intended effects of one medication may worsen another condition and the side effects of several medications may worsen one or more conditions. [FO ¶ 9]. At the time of the hearing before the ALJ, O.L. was taking Zoloft[3] (50 mg), Tenex[4] (4 mg), Abilify[5] (30 mg), and Protonix[6] (20 mg). [FO ¶ 27].

### 2. O.L.'s Educational History Prior to High School

During kindergarten, the 1997-98 school year, O.L. attended an autism class and began first grade in the same educational placement. [FO ¶ 44]. Three months into first grade, the Board placed O.L. in an inclusion class with eight high-functioning children with autism and twenty-two neurotypical children. [FO ¶ 44]. O.L. progressed in math, but had considerable difficulty in reading, staying on task, and interacting socially. [FO ¶ 44]. In second grade,

---

[3]Zoloft, an antidepressant, is prescribed to control anxiety, obsessive traits, and possibly sensory overstimulation. [FO ¶ 28]. At this dosage, there are rarely any side effects. *Id.*

[4]Tenex is prescribed for muscle tics and aggression. [FO ¶ 29]. The main side effects are lowered blood pressure and sedation, although it may also cause headaches. *Id.*

[5]Abilify, an anti-psychotic, is prescribed to regulate mood, control agitation, and treat thinking disorders. [FO ¶ 30]. The main side effect is sedation. *Id.*

[6]Protonix is a proton pump inhibitor that controls GERD. [FO ¶ 17].

O.L. continued with this placement while being aided by a full-time paraprofessional.  [FO ¶ 44].

In third grade, O.L. began attending Coral Reef Elementary in a mainstream classroom, aided by a paraprofessional, and received resource services for English and reading. [FO ¶ 45].  At this time, his greatest problem was inattentiveness.  [FO ¶ 45].  While in fourth grade, O.L. received instruction in general education classes with thirty-five students, later with forty-one students in fifth grade.  [FO ¶ 45].  He also received resource-room instruction in classes of twelve to seventeen students during both years.  [FO ¶ 45].  The Parents were supplementing O.L.'s instruction at their expense, with reading programs tailored to his learning style.  [FO ¶ 45].

During fourth and fifth grade, O.L.'s social interactions were limited and he displayed inappropriate social behavior.  [FO ¶ 52].  Vomiting became frequent in fifth grade, although it subsided later in the school year, and O.L. began exhibiting anxiety about school.[7]  [FO ¶ 53].  Between fifth and sixth grade, verbal aggressiveness began to emerge as a problem and it continued to increase during sixth grade.  [FO ¶ 54].

In sixth grade, O.L. began attending Palmetto Middle School.  [FO ¶ 54].  O.L. was falling behind during the school day because of his slow processing speed, which required him to spend more time at night to catch up.  [FO ¶ 54].  His vomiting increased in frequency, accompanied by headaches, fatigue, and stomach aches.  [FO ¶ 54].  O.L. would fall asleep at school after putting his head down on a table and would often sleep for several more hours once he arrived home.  [FO ¶ 54].  He developed atypical sleep patterns, became less compliant and redirectable at home, and reverted more frequently and persistently to his obsessive-compulsive rituals.  [FO ¶ 54].  In mid-December 2003, during the mid-point of sixth grade,

---

[7]Fifth grade marked the start of intensive homework.  [FO ¶ 53].

S.L. reported to Dr. Tuchman a sudden deterioration in O.L.'s behavior over a two week period.[8]  [FO ¶ 14].  Due to his illness, O.L. had sixteen absences and seventeen early pickups in sixth grade.  [FO ¶ 54].

O.L.'s health further deteriorated early in seventh grade, culminating in his withdrawal from school in December 2004.  [FO ¶ 55].  During that fall, O.L. began to suffer what S.L. described as a series of "crises" where he would turn to his mother with a stream of profanity and verbal aggressiveness while on the way to school, or after school.  [FO ¶ 19].  After each crisis, O.L. would cry extensively and say that he could not stop himself, he was very bad, and he was sorry for what he had done.  [FO ¶ 20].  Dr. Tuchman determined that the crisis behaviors were not under O.L.'s control.  [FO ¶ 20].  In October 2004, Dr. Tuchman found that O.L.'s obsessive-compulsive disorder and tics had worsened, he was experiencing headaches and vomiting, and although O.L. was doing well at school, he was doing "really poorly" at home.  [FO ¶ 21].

On one occasion, O.L.'s crisis behaviors escalated.  After not being allowed to purchase a lock, one of his favorite things, O.L. began screaming and yelling and engaged in his typical obsessive-compulsive behavior of hitting his ears, grunting three times, and tapping his mother's arm three times.  [FO ¶ 23].  However, the taps became hits and O.L. became very violent.  [FO ¶ 23].  He began to bite, thrash about, and scream when his father attempted to restrain him.  [FO ¶ 23].  The crisis, which lasted an hour, ended when the Parents gave O.L. medications they had on hand for emergency use.  [FO ¶ 23].  Subsequent crises required the Parents to administer the emergency medications five to ten times that fall.  [FO ¶ 24].

---

[8]Because Dr. Tuchman had not yet found an effective mix of medications at that time, he suggested that O.L. see another health care provider, but continued to see O.L. as needed. [FO ¶ 14].

During this period, O.L.'s chief complaints were vomiting twice daily for six months, headaches of increased frequency, increased sleepiness, and ringing in the ears. [FO ¶ 25]. Dr. Munoz admitted O.L. to Miami Children's Hospital on October 25, 2004 for a three day diagnostic visit. [FO ¶ 25]. After his discharge from Miami Children's, O.L. returned to school; his behaviors and illness worsened until the Parents withdrew him in December 2004. [FO ¶ 26]. By the time of his withdrawal, O.L. already had twenty-four absences. [FO ¶ 55].

Shortly after his withdrawal, the Board began to provide homebound instruction. [FO ¶ 55]. The Parents considered the possibility of psychiatric hospitalization to manage O.L.'s behavior, which was essentially uncontrollable and verging on psychotic. [FO ¶ 56]. However, with a couple of hours of homebound instruction daily, O.L. progressed in science and social studies and made some possible progress in English, but made no progress in reading. [FO ¶ 57]. The Parents supplemented his instruction by adding a tutor for three hours each afternoon. [FO ¶ 57]. After the third grading period, the Parents discontinued subject-matter tutoring, but retained tutoring for study and organizational skills. [FO ¶ 57]. O.L. ceased vomiting within three months of his withdrawal from school. [FO ¶ 58]. For the remainder of seventh grade, O.L. returned to school part-time, attending four periods a day and going home for two periods of homebound instruction. [FO ¶ 58].

During the summer of 2005 after seventh grade, O.L.'s family took a trip to Idaho along with five other families. [FO ¶ 62]. O.L. did well, even though many teenagers were present. [FO ¶ 62]. He was able to relax, go to lunch with others, become independent, and the head tics he had for many years almost vanished. [FO ¶¶ 58, 62]. O.L. fished on his own, returning every two hours to check in with the Parents as instructed. [FO ¶ 62].

Based on Dr. Gonzalez's advice, O.L. returned to school for eighth grade, taking four periods at school and two periods at home, and the Parents discontinued home instruction to

keep from overworking him. [FO ¶¶ 63, 73]. After nine weeks, the Board and the Parents agreed to add a fifth subject at school, reducing homebound instruction to one period. [FO ¶ 63]. Immediately, O.L. became more anxious and irritable and could not fall asleep. [FO ¶ 63]. Because of his reading score of less than three on the FCAT, the Board and the Parents agreed to add a sixth academic subject at school, reading. [FO ¶ 64]. O.L. received individual instruction from a one-on-one teacher for one period, where he primarily worked on math. [FO ¶ 64]. The Parents also obtained two hours of daily instruction for O.L. at home. [FO ¶ 64]. In early 2006, the Board and the Parents added a seventh period for the remainder of eighth grade.[9] [FO ¶ 69]. The class was a high-interest elective, home economics, to motivate O.L. at school given his interest in cooking. [FO ¶ 69]. Dr. Gonzalez endorsed the additional class to address O.L.'s academic and social needs. [FO ¶ 69].

At the start of eighth grade, O.L.'s head tics worsened again, impeding his ability to read and socialize due to their severity. [FO ¶ 73]. The head tics eased and intensified throughout eighth grade, even during the course of a day, depending on the level of stress produced by whatever he was doing at school.[10] [FO ¶ 73]. O.L. became explosive after school during eighth grade, although he never exploded at school or toward teachers, administrators, or peers. [FO ¶ 74]. The Parents found they could de-escalate O.L.'s behaviors at home by giving him more release time, such as allowing him to go fishing on his own or watch videos at night when he could not sleep. [FO ¶ 74]. Thus, by the end of eighth grade, O.L.'s behaviors had improved. [FO ¶ 74].

---

[9]O.L. was the only child at school with a seventh period. [FO ¶ 69].

[10]For example, the head tics intensified during the week of FCAT testing, as well as the week preceding and following testing. [FO ¶ 73].

Ms. Liliana Brizo ("Ms. Brizo"), O.L.'s eighth grade reading and English teacher, testified at the hearing before the ALJ that O.L. made "very little" progress during his five-month period in eighth grade. [FO ¶ 65]. Ms. Brizo attributed O.L.'s failure to improve his reading comprehension to his frequent absences and late arrivals, and indicated that he often came to class disheveled.[11] [FO ¶ 66]. She also indicated that O.L. was often tired and laid his head down during her reading class. [FO ¶ 66]. Although he was easy to motivate, Ms. Brizo stated that O.L. needed to be motivated and "needed to start listening." [FO ¶ 66].

### 3.  Individualized Educational Plan ("IEP") Planning Process and Procedures

In preparation for O.L.'s transition to high school, an IEP team was assembled. [FO ¶ 96]. The team conducted meetings on April 24, May 16, and May 22, 2006 to develop an IEP. [FO ¶ 96]. The parties worked collaboratively during the April 24 meeting. [FO ¶ 97]. Ms. Fran Collette ("Ms. Collette"), a child advocate who attended all three IEP meetings to assist the Parents, described the meeting as structured and that the Board elicited information from the Parents. [FO ¶ 97]. The Parents advocated for a smaller school and a full academic load. [FO ¶ 95]. The IEP team listened to some of the Parents' information, deferred consideration of the remainder, but limited discussion. [FO ¶ 97]. Ms. Twila Grandchamp ("Ms. Grandchamp"), an Exceptional Student Education ("ESE") director for the Board, indicated that the IEP team would not discuss the setting of MAST Academy. [FO ¶ 98]. She further stated that because the documents the Parents produced were in the record and, requiring no discussion, she permitted none. [FO ¶ 100]. The results of a Woodcock Johnson reading comprehension test, which was administered shortly before the IEP meetings, was also omitted from the meetings. [FO ¶ 107].

---

[11]Inattentiveness and sleepiness are symptoms of O.L.'s disabilities; absences and tardiness are common byproducts of those symptoms. [FO ¶ 68].

Ms. Collette described Ms. Grandchamp as "curt"and "less congenial" at the May 16 meeting. [FO ¶ 110]. The IEP team decided upon the setting, Palmetto Senior High School ("PSHS"), at the May 16 meeting, prior to the end of the planning process and before the IEP was completed. [FO ¶ 112]. While Ms. Grandchamp did allow someone from MAST Academy to make a presentation, she did not allow any discussion following the presentation and stated that no other site would be considered. [FO ¶ 112]. Ms. Isabel Lara ("Ms. Lara"), a licensed physical therapist with a treatment center for children ages two to seven, also attended the May 16 IEP meeting and spoke extensively to the IEP team about sensory overload and tactile stimulation. [FO ¶ 111]. She and the Board's occupational therapist spoke about some effective compensatory strategies to modulate stimulation and allow O.L. to focus on his tasks. [FO ¶ 111].

According to Ms. Collette, the mood at the May 22 meeting was "okay, let's get this done." [FO ¶ 113]. The IEP team addressed the educational program to be implemented at PSHS. [FO ¶ 113]. Although the Parents tried to bring up issues, Ms. Grandchamp ran the IEP meeting firmly, disallowing the Parents to insert issues that she did not want addressed. [FO ¶ 113]. Consequently, the IEP team discussed more limited matters with the Parents. [FO ¶ 113].

### 4.  O.L.'s IEP

The completed IEP, dated May 22, 2006, assigned O.L. to PSHS for ninth grade during the 2006-07 school year, noting he would be working on a standard diploma. [FO ¶¶ 116, 121, 153]. O.L. was placed from zero to forty percent of the time in a "separate class," meaning he will be placed with general education students from zero to forty percent of the time. [FO ¶¶ 116, 126]. He would receive general education and ESE instruction for science and home economics, while receiving exclusively ESE instruction with no more than three students,

including O.L., for English, math, reading, and learning strategies.  [FO ¶¶ 118, 128].

Although O.L. was initially assigned to a class in the Autism Unit for English and reading,

after the PSHS master schedule was developed, consideration would be given to placing him

in a general education English and reading class with a smaller teacher/pupil ratio.  [FO ¶

118].  The IEP also indicated O.L. was not to receive a shortened school day.  [FO ¶ 125].

The IEP contained numerous adaptations, including dismissing O.L. three minutes

early, giving O.L. a pass to use the restroom without disrupting class, identifying and

encouraging peer relationships for academics and social interactions, assigning preferential

seating near the teacher, giving O.L. breaks while working, and allowing O.L. to walk outside

with a paraprofessional to get a snack when he is not feeling well.  [FO ¶ 151].   The

paraprofessional was responsible for meeting with O.L. prior to the start of school in a

designated area, to accompany him to lunch and on fire drills, and to assist in all classes on

a daily basis.  [FO ¶¶ 118, 122].  O.L. would also receive monthly autism support at PSHS.

[FO ¶ 122].

### 5.  O.L.'s Experience at PSHS

During the summer of 2006, prior to entering PSHS, O.L. was more compliant at home,

so long as he could fish, a hobby that he seems to enjoy.  [FO ¶ 81].  He was less oppositional

and required less redirection, while his head tics and obsessive-compulsive behaviors almost

vanished.  [FO ¶ 81].  Dr. Gonzalez described him as "clinically stable and happy" and

cooperative during this period.  [FO ¶ 33].  He found that O.L. was enjoying the company of

others and experiencing social success with peers.  [FO ¶ 33].  Although O.L. expressed

concern about fitting in at PSHS and had begun to show anxiety, it was not excessive.  [FO ¶

33].

The Parents allowed O.L. to attend PSHS at the start of the 2006-07 school year. [FO ¶ 154]. Even though they liked PSHS, where O.L.'s older brother attends, they did not believe it was suitable for O.L., whom they feared would suffer another breakdown similar to that of December 2004. [FO ¶ 154]. O.L. attended PSHS for eleven days, from August 17 to September 1, 2006, at which time the Parents withdrew him. [FO ¶ 155].

Ms. Suzanne Murray ("Ms. Murray"), an autism support teacher who has taught for eighteen years and was assigned to O.L. and his teachers, met with O.L. at PSHS on the morning of his first day to help with the transition. [FO ¶¶ 156, 157]. O.L. separated willingly from the Parents, who separated willingly from him. [FO ¶ 157]. She found O.L. to be very animated and engaging; he spoke eagerly about his interests, such as fishing, and asked questions about the class, lunch, and the rules at PSHS. [FO ¶ 157]. Ms. Murray and O.L.'s paraprofessional, who worked with O.L. the prior year, explained to him that, among other things, he would eat outside where it was quieter. [FO ¶ 157].

Ms. Karen Uhle ("Ms. Uhle"), the ESE teacher assigned to O.L., is Board-certified in ESE and has taught for thirty years. [FO ¶ 156]. Her classroom is located at one end of the school near an entrance. [FO ¶ 159]. It is not situated in a busy hallway, nor do large numbers of students pass by it. [FO ¶ 159]. The classroom itself is small, with three student tables, a teacher's desk, a computer, and a fish tank. [FO ¶ 159]. O.L. received instruction in English, math, reading, and study skills in Ms. Uhle's class. [FO ¶¶ 159, 163]. For English, there were twelve students present in the class. [FO ¶ 163]. She found that O.L. was the hardest worker in her class. [FO ¶ 161].

Ms. Murray observed O.L. briefly in English and found he tolerated well the tardy arrival of the teacher. [FO ¶ 163]. The class was very structured, making it easier for him to concentrate. [FO ¶ 163]. O.L. also displayed no anxiety during the class and interacted

appropriately with the other students.  [FO ¶ 163].  Ms. Murray accompanied O.L. as he changed classes to attend his inclusion science and social studies classes.  [FO ¶ 164].  He was attracted to the locks on the rows of lockers, but after touching each of them down a hallway, he complied with Ms. Murray's request not to touch them.  [FO ¶ 164].  She attended science with O.L. one day and found that he participated appropriately in class, he raised his hand, answered questions, and was eager to participate.  [FO ¶ 165].  Although the classroom was set up in three long rows and was very crowded, the density had no apparent effect on O.L. [FO ¶ 165].  Ms. Murray also attended home economics with O.L. one day.  [FO ¶ 166].  In this class, students sat two to four persons per table, with eighteen to twenty students seated at six tables.  [FO ¶ 166].  Two students sat at O.L.'s table and interacted with him.  [FO ¶ 166]. Although he displayed some anxiety while in class, he did not bother any students.  [FO ¶ 166].

Ms. Murray saw O.L.'s head tics on the first day, but said the tics were not too noticeable.  [FO ¶ 158].  Although, Ms. Uhle described his head tics as pronounced on the first day, the paraprofessional said the tics were not as bad as they had been at times in eighth grade.  [FO ¶ 158].  Ms. Murray testified at the hearing before the ALJ that O.L.'s head tics were never particularly frequent, except for one occasion when the tics tapered off by the end of the day.  [FO ¶ 158].  Dr. Annmarie Sasseville ("Dr. Sasseville"), an instructional supervisor in autism who saw O.L. during the previous summer and four times at PSHS, noticed that his head tics increased on the second Monday of school.  [FO ¶¶ 100, 158].  She was "alarmed" by the tics, which exceeded anything she had seen previously in O.L., but stated that the tics decreased by the end of the day to levels similar to the first week.  [FO ¶ 158].  Conversely, Dr. Gonzalez reported that within two weeks of starting classes at PSHS, O.L.'s head tics became more pronounced.  [FO ¶ 34].

Ms. Murray observed O.L. several times in Ms. Uhle's class and only saw him lower his head to his desk in fatigue once, at which point he complained of a headache. [FO ¶ 162]. He went home early that day, which is the only time Ms. Murray saw O.L. ill or leave school early. [FO ¶ 162]. O.L. did not present behavior management issues to teachers or administrators. [FO ¶ 43]. When O.L. acted out while at school, he limited himself to verbal aggression directed at his mother. [FO ¶ 43].

O.L., however, presented a starkly different picture at home, as opposed to the way he conducted himself at school. [FO ¶ 168]. By the third day of school, he vomited, displayed a moderate head tic that was minimal the preceding summer, and started to express anxiety. [FO ¶ 168]. After the fifth day, O.L. developed a "complete facial contortion" S.L. described as "inhumane." [FO ¶ 168]. Although the Parents wanted to remove O.L. from school, Dr. Gonzalez suggested they hold off, instead increasing his medications. [FO ¶ 169]. After doing so, O.L.'s tics and elevated blood pressure went down, but he continued to vomit. [FO ¶ 169]. Dr. Gonzalez then stated he could not increase the medications any further and advised the Parents to remove O.L. from school. [FO ¶ 169].

By this time, O.L.'s anxiety was very high and he had a hard time falling asleep due to his rapid heart rate. [FO ¶ 170]. O.L. was no longer redirectable—he could no longer accept that he could not go fishing during lightning storms, something he was able to accept the preceding summer. [FO ¶ 170]. O.L. restarted his obsessive-compulsive behaviors of hitting his ears, grunting, and tapping his mother's arm three times. [FO ¶ 170]. He was throwing himself on the floor, screaming, and breaking doors again. [FO ¶ 170]. Fearing a repeat of the breakdown in December 2004, the Parents withdrew O.L. from PSHS. [FO ¶ 171].

Dr. Gonzalez reported that within two weeks of starting classes at PSHS, O.L.'s tolerance of office visits went down. [FO ¶ 34]. O.L. began to do compulsive rituals, like

tapping his mother compulsively, something Dr. Gonzalez had not seen in a long time.  [FO ¶ 34].  O.L. also engaged in outbursts when someone set limits on his behavior, which Dr. Gonzalez had never seen before.  [FO ¶ 34].  Conversely, Dr. Gonzalez noted that once O.L. withdrew from PSHS, these behaviors began to moderate.  [FO ¶ 34].

Since leaving PSHS, O.L. fishes nearly every day, an activity S.L. describes as no longer manageable and that has become an "obsession."  [FO ¶ 172].  O.L. told the Parents that he was happy going to PSHS and wanted to attend the school his friends from elementary school and older brother attend, but he complained of the crowding and noise in the auditorium and cafeteria.[12]  [FO ¶ 171].  According to S.L., O.L. attributes his illness to attending PSHS, but expresses concern that he will be assigned to a school with all ESE students.  [FO ¶ 172].

S.L. acknowledged that O.L. is not so auditorily challenged that he cannot manage the sound levels of grocery stores, restaurants, and theme parks.  [FO ¶ 95].  She explained that, knowing he does not have to perform math or reading, O.L. can tolerate higher noise levels.  [FO ¶ 95].  O.L. can tolerate higher levels of auditory stimulation and other sensory challenges when he is not stressed or fatigued or when he is pursuing a keen interests, such as fishing.  [FO ¶ 95].

### 6.   Professional Witnesses' Recommendations

The University of Miami Psychological Services Center administered a psychoeducational evaluation in July 2002, after fourth grade.  [FO ¶ 46].  The report cites O.L.'s significant difficulties with attention and impulsivity/hyperactivity as a factor affecting his school performance and notes he has a tendency to focus on "background noise" and to

---

[12]O.L. has not developed sufficient self-reporting skills.  [FO ¶ 171].  If the Parents ask him if he is okay, he will say yes, even if he is not doing well.  [FO ¶ 171].  For example, in seventh grade before his breakdown in December 2004, O.L. was never unhappy and never reported dissatisfaction with his school setting.  [FO ¶ 171].

listen superficially, possibly due to his auditory processing problems. [FO ¶ 48]. The report recommends, among other things, that O.L. have a continued involvement in social skills groups with peers his age. [FO ¶ 49].

Dr. Munoz, who has seen O.L. three times in 2004 and again in June 2006, indicated his impression of O.L. was that he was very stressed and not at peace. [FO ¶ 18]. Dr. Munoz found him fearful and unstable, determining he was overstimulated. [FO ¶ 18]. He concluded that stress exacerbates O.L.'s GERD. [FO ¶ 18].

On July 11, 2006, Dr. Gonzalez, who had managed O.L.'s medications since 2004, completed an evaluation and treatment plan for O.L. [FO ¶¶ 22, 31]. In the report, Dr. Gonzalez notes O.L. has a hard time processing and integrating sensory input and can easily be overwhelmed by his environment. [FO ¶ 31]. While past failures in school and social interaction have left O.L.'s self-esteem damaged, he continues to want and seek peer relationships, despite the difficulties in maintaining appropriate social interactions. [FO ¶ 31]. Dr. Gonzalez opines that, for psychological reasons, segregation from peers would reinforce O.L.'s self-image as "damaged." [FO ¶ 31]. According to Dr. Gonzalez, the difficulty in structuring an appropriate educational environment for O.L. is that his sensitivity to stimulation demands a "setting that is [not] physically and emotionally overwhelming, because [such a setting] will lead to illness and emotional breakdown." [FO ¶ 32]. He believes the "relationship between environmentally induced stress and physical (e.g., vomiting, insomnia, exacerbation of motor and vocal tics) symptoms and emotional decompensation have been clearly and repeatedly demonstrated." [FO ¶ 32].

Dr. Gonzalez opines that children with auditory overstimulation problems need an environment with fewer people, that is less crowded and less dense, and with lower noise levels. [Gonzalez Dep. 28:14-30:9]. Although initially advocating for a school with less than

700 students, Dr. Gonzalez stated O.L. needs an environment that is less overwhelming in terms of its sensory input and a more manageable environment, as opposed to a strict environmental limit of no more than 700 children.  *Id.*

Dr. Gonzalez was unsurprised by the discrepancy between O.L.'s behavior and symptoms at school, versus his behavior and symptoms at home.  [FO ¶ 35].  He described a phenomenon where persons could control and internalize a behavior, like tics and headaches, while in an environment in which they must perform or around others whom they do not know very well, but then suffer an overflow of that behavior once they have removed themselves to a more secure environment, like a home.  [FO ¶ 35; Gonzalez Dep. 38:23-39:11, 56:7-57:5].  He also noted that it is not uncommon for children with Tourette's, a similar syndrome to Asperger's Disorder, to manifest stress later in time after being in a stressful situation. [Gonzalez Dep. 56:12-18].

Dr. Kaskel, who also has seven years experience teaching, has seen O.L. for ten years and successfully used behavior modification to address his obsessive-compulsive behaviors, attention issues, and language issues.  [FO ¶ 70].  On April 2, 2005, she completed a report based on three evaluations in March, after O.L. returned to seventh grade following his December 2004 breakdown.  [FO ¶ 59].  The report states O.L.'s illness was "in part attributed to the stress caused by his previous academic situation."  [FO ¶ 59].  Describing his education as a "full" school day followed by individual, multi-sensory instruction at home, Dr. Kaskel notes that "[t]he stress of a demanding school day for a sensory impaired child followed by intensive individualized tutoring precipitated [O.L.'s] recent physical illness."  [FO ¶ 60].  She recommends that, due to O.L.'s auditory defensiveness," his class size should not exceed twenty-eight students.  [FO ¶ 61].

In a letter dated December 1, 2005, Dr. Kaskel advocated for a lighter academic load due to the re-emergence of symptoms that were a precursor to O.L.'s breakdown a year earlier in seventh grade. [FO ¶ 71]. She suggested the removal of O.L.'s second period class at school, but carefully noted she was not recommending homebound instruction for this class. [FO ¶ 71]. Dr. Kaskel explained that O.L.'s "problem is related to the number of academic courses he is subject to on a daily basis rather than the number of hours he is physically attending school," and attributed his December 2004 breakdown to the demands placed on him by the school. [FO ¶ 71].

In an undated report, Dr. Kaskel states she, Dr. Gonzales, Ms. Lara, and O.L.'s audiologist all agreed O.L.'s December 2004 breakdown "resulted to a significant degree from the sensory overload he was exposed to in the large middle school environment." [FO ¶¶ 77, 79]. She indicates that "[t]he fact that [O.L.] in addition to an intensive academic schedule was receiving after-school instruction on a daily basis to facilitate his ability to absorb his schoolwork was also a major contributor to his illness." [FO ¶ 79]. Dr. Kaskel concludes by advocating for a school with 700 or fewer students "in a low density setting," and adds that O.L.'s "hypersensitivity and difficulty with sensory regulation" drive the acceptable class size, which is no more than 20 students in a "well-structured classroom setting." [FO ¶ 80].

During her deposition, Dr. Kaskel opined that O.L. needs a smaller, more manageable physical plant due to its impact on noise level. [Kaskel Dep. 26:22-25, 28:14-21]. Although she initially advocated for a school size smaller than 700 students, Dr. Kaskel indicated that a physical plant with a student population of around 1,000 or less would be appropriate for O.L., but that 3,400 would not because the volume of students, the physical plant of the school, the noise, and the movement in the environment could have an adverse affect on O.L. [Kaskel

Dep. 48:7-49:1].  However, Dr. Kaskel stated she was not recommending a population that was not crowded only during the time O.L. was part of the environment.  [Kaskel Dep. 31:11-15].

Dr. Peter Gerhardt ("Dr. Gerhardt"), of the Gerhardt Autism/Asperger's Consultation Group, prepared a consultative report on September 1, 2006, mostly based on an observation of O.L. on July 29, 2006, interviews with the Parents, and the medical and educational records.  [FO ¶ 82].  One of the report's recommendations is a "school/classroom environment designed to reduce school-related anxiety and its concomitant physical presentation."  [FO ¶ 88].  Due to O.L.'s history of school-related anxiety and stress, the report states it is of critical importance to specifically tailor O.L.'s educational environment to: "1) reduce his anxiety/stress, 2) promote the development of self monitoring/self management competencies relevant to stressful environment conditions, and 3) provide consistently positive interactions with peers, teachers and related school personnel."  [FO ¶ 88].  The recommendation concerning the design of the school/classroom environment includes  limiting the regular education class size to twenty to twenty-five students; limiting the "overall size of the school," since a "smaller school size [would be] a necessary component of an appropriate education;" and reducing to a minimum unnecessary auditory, visual or tactile stimulation.  [FO ¶ 89].

The report also warns that social competence instruction "in isolation and absent regular opportunities to generalize newly learned skills is . . . ineffective and educationally inappropriate."  [FO ¶ 90].  Dr. Gerhardt opines that, even though mere exposure to typical peers, without instruction, is not sufficient to help O.L. remediate his deficit in social skills, exposure to such peers are crucial for his development.  [FO ¶ 93].  During his deposition, Dr. Gerhardt indicated that in O.L.'s case, much as it is with many children with Asperger's Disorder, a smaller school would be preferable to help him adapt well into society.  [Gerhardt Dep. 20:9-22:5].  Dr. Gerhardt stated that the more people at the school, the greater the

number of variables in the environment and, thus, the greater the challenges for O.L. [Gerhardt Dep. 70:4-20; Tr. 1437:14-16]. He also noted that it is not uncommon for children with Asperger's-type syndromes to manifest stress later in time after being in a stressful situation. [Gerhardt Dep. 79:19-80:8]. Dr. Gerhardt testified at the hearing with the ALJ to the "critical importance" of tailoring O.L.'s educational environment to reduce his anxiety and stress and promote his ability to self-monitor and self-manage stressful environmental conditions. [FO ¶ 94].

Ms. Lara first saw O.L. in October 2004 and conducted a re-evaluation and home assessment in 2006, issuing a report dated May 14, 2006. [FO ¶¶ 36-37]. Her report notes that, although decreasing, O.L. continues to exhibit signs of tactile defensiveness. [FO ¶ 38]. The report states O.L. continues to experience difficulty with auditory processing and shows auditory defensiveness, being extremely apprehensive with loud or unexpected noises, and distracted by background noises that require verbal cueing to get his attention back to the subject task. [FO ¶ 39]. The report indicates O.L. is better at controlling his impulsivity and asks for specific sensory motor activities to help him self-organize and notes he expresses his emotions verbally. [FO ¶ 40].

During her deposition, Ms. Lara recommended a high school setting with less than 700 students to decrease overstimulation of O.L.'s auditory and tactile sensory systems because O.L. began having problems when he transitioned from elementary to middle school, indicating that the number 700 came from the approximate number of students in an elementary school. [Lara Dep. 18:1-17, 19:8-11]. However, she stated that she assumed O.L. had no medical issues while in elementary school and was not aware of how many students were in O.L.'s classroom at the elementary school. [Lara Dep. 19:12-21]. Ms. Lara also noted

that the number 700 did not come from O.L.'s elementary school, but from the elementary school she attended as a child. [Lara Dep. 18:18-19:1].

Ms. Collette testified during the hearing with the ALJ. Ms. Collette is a retired attorney with an undergraduate degree in elementary education. [Tr. 801:23-25, 802:8]. She has a twenty-three year old son with Asperger's Disorder and acts as a volunteer child advocate, assisting parents when their children have difficulty in school settings, in determining why, and to try to fix the problem. [Tr. 802:4-6, 802:22-803:1]. Although she has not had any formal training in understanding the diagnosis of Asperger's Disorder, Ms. Collette self-trained herself through research that she believes has allowed her to better understand the diagnosis. [Tr. 803:2-9]. Ms. Collette stated she finds children with Asperger's Disorder usually have more trouble than typical students in large high school settings and believes they tend to do much better in very small settings similar to a small elementary school. [Tr. 826:12-16]. This is because children with Asperger's Disorder tend to need breathing space, an environment that is not so noisy or jostled, and an environment where they do not perceive students who are aggressive or bullying, which is more prevalent at small elementary schools. [Tr. 827:8-15].

On May 12, 2006, the Parents asked Ms. Rae Burnham ("Ms. Burnham") for a written response on their concern that O.L. would not be able to function at PSHS due to its 3,600 student population and their preference for MAST Academy, a magnet school operated by the Board on Key Biscayne. [FO ¶¶ 101, 102]. Ms. Burnham has taught with the Board for twenty-nine years, holds a master's degree in special education, and taught O.L. in seventh and eighth grade before she transferred to PSHS, where she monitors eleventh and twelfth grade ESE students' work. [FO ¶¶ 101, 103]. In her letter dated May 15, 2006, Ms. Burnham states O.L.'s "sensitivity to noise and other stimuli's [sic] increased dramatically in the 7th

grade. . . . Due to the set up and arrangement of the classroom, there was a tremendous amount of noise and stimulation." [FO ¶ 103]. The letter reports O.L. became "increasingly less tolerant," until he was unable to participate at all. [FO ¶ 103]. She contrasted that in eighth grade, O.L. was in a "smaller class setting with less students and more structure," with each student having his/her own desk and not being allowed to roam around the class. [FO ¶ 103].

Ms. Burnham described PSHS as a huge "city" with halls that are "overcrowded with people." [FO ¶ 104]. She believed "the situation [at PSHS] would be difficult for [O.L.] to tolerate and his functional performance would once again regress as it did in the 7th grade." [FO ¶ 104]. Ms. Burnham's letter did not reach the IEP team and, thus, was not provided during the IEP meetings. [FO ¶ 106]. During the hearing with the ALJ, Ms. Burnham testified that she had not submitted the letter to the Parents after the assistant principal for ESE advised her that she should not do so because the letter could be taken as School Board policy. [Tr. 479:1-16]. She also testified her letter was written with the assumption that O.L. would be placed in an inclusion setting, which is not the case and that she now believes O.L.'s needs could be met at PSHS. [Tr. 492:1-493:1].

**B.    _Administrative Law Judge's Findings_**

The ALJ found that there was no evidence of a material violation of any procedural requirements, but determined that the proposed IEP deprived O.L. of a Free and Appropriate Public Education ("FAPE") in two areas. [FO ¶¶ 174-175]. First, the IEP did not adequately address O.L.'s educational needs arising from his illnesses and disorders, failing to: (1) describe O.L.'s susceptibility to stress and sensory overload; (2) identify measurable goals and benchmarks to monitor O.L.'s progress and the effectiveness of the IEP in managing stress and sensory overload; and (3) identify services necessary so O.L. can manage stress and

overload and access his education.  [FO ¶ 175].  Although the adaptations in the IEP did a reasonably good job of meeting O.L.'s needs, the services themselves still failed to provide a FAPE.  [FO ¶¶ 183-184].  Second, the IEP failed to adequately address O.L.'s educational needs in reading, while the services concerning reading failed to provide O.L. with a FAPE. [FO ¶¶ 187, 192].

The ALJ found that, on its face, the remainder of the proposed IEP provided O.L. with a FAPE.  [FO ¶ 194].  He found that neither the law nor the facts supported the contention that a FAPE required a setting of MAST Academy.  [FO ¶ 195].  The ALJ assigned little weight to the shared opinion of the Parents' professionals that O.L. required a small high school to control environmental stimulation and to allow access to his education.  [FO ¶ 196]. The professionals' testimony was based on educational expertise they did not have and failed to address the myriad of variables that were necessary to assess the stipulatory potentials of a school setting of under 700 students.  [FO ¶¶ 196-197].  Likewise, the record offered no support for instructional services in a hospital/educational setting, as recommended by the Board's expert, because that departed from the requirements of the least restrictive environment.  [FO ¶ 198].  Thus, the ALJ determined that the final decision to place O.L. at PSHS did not deprive him of a FAPE.  [FO ¶ 200].

## II.   THE APPLICABLE LAW

### A.   Individuals with Disabilities Education Act

The purposes of the IDEA are to: (1) ensure that all disabled children have a free and appropriate public education that emphasizes special education services designed to meet their unique needs and prepare them for further education, employment, and independent living; (2) protect the rights of disabled children and their parents; and (3) assist States and other agencies with providing education for disabled children.  20 U.S.C. § 1400(d)(1).  Under the

IDEA, disabled students are guaranteed a FAPE. *Sch. Bd. of Collier County v. K.C.,* 285 F.3d 977, 979 (11th Cir. 2002). A FAPE is defined as special education services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under section 1414(d). . . .

20 U.S.C. § 1401(9).

To provide a FAPE, a school formulates an IEP during a meeting between the student's parents and school officials. 20 U.S.C. § 1414(d)(1)(A)-(B). An IEP is a written statement for each disabled child that includes a statement of: the child's present levels of academic achievement and functional performance; measurable annual goals, along with a description of how the child's progress toward meeting those goals will be measured; the special education and related services to be provided to the child; and the program modifications or supports for school personnel that will be provided for the child. 20 U.S.C. § 1414 (d)(1)(A). The IEP team, which consists of the child's parents, school officials, and, if appropriate, the disabled child, reviews the child's IEP at least annually to determine whether the annual goals for the child are being met and revises the IEP as appropriate. 20 U.S.C. § 1414(d)(4). "During the IEP-developmental process, parental involvement is critical; indeed, full parental involvement is the purpose of many of the IDEA's procedural requirements." *M.M. v. Sch. Bd. of Miami-Dade County,* 437 F.3d 1085, 1095-96 (11th Cir. 2006) (citing *Doe v. Ala. State Dep't of Educ.,* 915 F.2d 651, 661 (11th Cir. 1990)); *see also* 34 C.F.R. § 300.501(b); Fla. Admin. Code R. 6A-6.03311(4)(d). However, the school board is not required to provide an education according to the mandates of the parents. *Weiss v. Sch. Bd. of Hillsborough County,* 141 F.3d 990, 998 (11th Cir. 1998).

Included in a FAPE is the requirement that the child be educated in the least restrictive environment ("LRE") possible.  20 U.S.C. § 1412 (a)(5); 34 C.F.R. § 300.114(a)(2). A LRE requirement means the school must educate the child in an environment that is as close to a typical education as possible, but that will still give the child an appropriate education:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separating schooling, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see* 34 C.F.R. § 300.114(a)(2).  The LRE is often found in a regular public school, supplemented with any special programs that are tailored to that child's specific needs, giving consideration to any potentially harmful effect on the child.  34 C.F.R. § 300.116(c)-(d).  If a child cannot be educated in a public school atmosphere, the child may be placed in a private school, while the most restrictive educational means would be placement in a full time resident facility.  *See Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985) (IDEA "provides for placement in private schools at public expense [where an education at a public school] is not possible."); *Loren F. v. Atlanta Indep. Sch. Sys.,* 349 F.3d 1309, 1312 (11th Cir. 2003) ("certain public schools are unable or unwilling to provide appropriate special education services").  Although a court can determine whether a placement as identified in an IEP is appropriate, it has no authority to direct any particular placement. *See Sch. Bd. v. J.M.,* 957 F. Supp. 1252, 1259 n.4 (M.D. Fla. 1997).

A school system is statutorily obligated to consult with the child's parents, and presumably with the child himself, before choosing a placement.  *Honig v. Doe,* 484 U.S. 305, 321 (1988) (citing 20 U.S.C. §§ 1401(19), 1415(b)) (noting "Congress' unquestioned desire to

wrest from school officials their former unilateral authority to determine the placement of [disabled] children"); *see also* 34 C.F.R. §§ 300.116(a)(1), 300.327, 300.501(b)(1)(i), (c). Additionally, placement must be based on the child's IEP. 34 C.F.R. § 300.116(b)(2). Placement means "*instruction in* regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.115(b)(1) (emphasis added).

"An IEP must be amended if its objectives are not met, but perfection is not required." *Loren F.,* 349 F.3d at 1312. Neither the IDEA nor a FAPE require a school board to provide services that will maximize a disabled child's potential or that provide the best possible education as if its resources were unlimited. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 189-90 (1982); *M.M.,* 437 F.3d at 1102-1103; *JSK v. Hendry County Sch. Bd.,* 941 F.2d 1563, 1573 (11th Cir. 1991). "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access [to education] meaningful." *Rowley,* 458 U.S. at 192. The IDEA "imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education." *Id.* at 195. "[T]he 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. However, a disabled child's advancement from grade to grade in a regular public school system does not mean the child is automatically receiving a FAPE. *Id.* at 203 n.25.

Federal Regulations require a prior written notice ("PWN") to a disabled child's parent whenever the school proposes or refuses to initiate or change the identification, evaluation, or educational placement of the child. 34 C.F.R. § 300.503(a); *see* 20 U.S.C. § 1415(b)(3); Fla. Admin. Code R. 6A-6.03311(1); *Doe,* 915 F.2d at 661. The PWN must include: (1) a description

of the action proposed or refused; (2) an explanation of why the action was proposed or refused; (3) a description of the evaluation procedures, assessments, records, or reports used to form the basis for the proposal or refusal; (4) a statement that protection under the procedural safeguards is available and how a copy of the procedural safeguards can be obtained; (5) sources to contact to obtain assistance in understanding the procedural safeguards; (6) a description of other options the IEP team considered and why those options were rejected; and (7) a description of other relevant factors. 34 C.F.R. § 300.503(b); *see* 20 U.S.C. § 1415(c)(1); Fla. Admin. Code R. 6A-6.03311(1)(c); *Doe,* 915 F.2d at 661. However, harm must be shown as a result of the alleged procedural violation for a court to grant relief. *See Weiss*, 141 F.3d at 996; *Doe,* 915 F.2d at 662.

Under Florida law, the parent has the right, "upon request directed to the appropriate school official, to be provided with a list of the types of records and reports, directly related to students, as maintained by the institution that the student attends or has attended." Fla. Stat. § 1002.22(3)(a)(1). The parent also has the right to inspect and review the child's educational records, which the school board must provide within a reasonable period of time after such a request is made, but in no more than thirty days. Fla. Admin. Code R. 6A-1.0955(6)(b); 34 C.F.R. § 300.501(a). "[W]hile prejudice to the [parent] is presumed, if the [school board] can demonstrate that the [parent] has not been prejudiced thereby, then the [parent] will not be relieved of liability merely by a showing that notice was not given 'as soon as practicable.'" *Tiedtke v. Fid. & Cas. Co.,* 222 So. 2d 206, 209 (Fla. 1969). Likewise, a court may not grant relief if no actual harm results from the procedural violation. *See Doe,* 915 F.2d at 661-62; *Weiss,* 141 F.3d at 994.

If the parents and school board cannot agree on the contents of the IEP or believe the child has been denied procedural or substantive rights of a FAPE, either party may request

a due process hearing. 20 U.S.C. § 1415(f). In Florida, due process hearings are conducted by an administrative hearing officer of the Florida Division of Administrative Hearings ("DOAH"). Fla. Stat. § 230.23(4)(m)(4). The DOAH decision is a final order, which entitles a party adversely effected to bring an action in either a federal district court or a state court of competent jurisdiction. 20 U.S.C. §§ 1415(g), (i)(2).

### B.    *Standard of Review*

The issue before the Court, whether the IEP provided a FAPE, is a mixed question of law and fact and subject to a *de novo* review. *K.C.,* 285 F.3d at 979. The Court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415 (i)(2)(b).

The Supreme Court has established a two-part inquiry for reviewing suits brought under the IDEA. *Doe,* 915 F.2d at 655 (quoting *Rowley,* 458 U.S. at 206). Specifically, the Court must inquire:

> First, has the State complied with the procedures set for in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Rowley,* 458 U.S. at 206-07.

The reviewing court must give "due weight" to the established record of the administrative proceeding and must consider the administrative findings of fact, but is free to accept or reject them. *Id.* at 207; *see Walker County Sch. Dist. v. Bennett,* 203 F.3d 1293, 1297-98 (11th Cir. 2000). "To that end, administrative factfindings 'are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obligated to explain why.'" *Loren F.,* 349 F.3d at 1314 n.5 (quoting *M.M.,* 303 F.3d at 531).

At the same time, "the court is not limited to the administrative record. . . . The IDEA specifically provides that the court may take additional evidence and may fashion relief that the court deems appropriate." *Weiss,* 141 F.3d at 992 (citing 20 U.S.C. § 1415(c)(2)).  Where the court does not receive any additional evidence or testimony, it may "accept the conclusions of the ALJ . . . that are supported by the record and reject those that are not." *Loren F.,* 349 F.3d at 1314 (quoting *M.L. v. Fed. Way Sch. Dist.,* 341 F.3d 1052, 1062 (9th Cir. 2003)).

The amount of deference to be granted to the administrative decision is, thus, left to the sound discretion of the court. *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857 (11th Cir. 1988); *Walker County,* 203 F.3d at 1297-98; *K.C.,* 285 F.3d at 983.  The court must ensure that it does not substitute its own judgment on sound educational policy for those made by officials at the state administrative level. *Rowley,* 458 U.S. at 206; *Walker County,* 203 F.3d at 1297.  On the other hand, the Court is not simply a rubber stamp for the decisions of  school officials that implement federal law, the IDEA. *See, e.g., Quackenbush v. Johnson City Sch. Dist.,* 716 F.2d 141, 146 (2d Cir. 1983) ("apparently Congress intended the court to have a significant role in achieving the substantive goals of the statute"); *County Sch. Bd. of Henrico County, Va. v. Z.P. ex rel. R.P.* 399 F.3d 298, 307 (4th Cir. 2005) ("the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate").

The burden of proof is generally on the moving party who is objecting to an existing or proposed IEP. *M.M.,* 437 F.3d at 1096 n.8 (citing *Schaffer v. Weast,* 546 U.S. 49 (2005)); *Devine v. Indian River County Sch. Bd.,* 249 F.3d 1289, 1292 (11th Cir. 2001).  Additionally, "deference must be paid to the educators who developed the IEP." *Devine,* 249 F.3d at 1292 (citing *JSK,* 941 F.2d at 1573).  Here, the Parents are the party objecting to the challenged IEP and, therefore, bear the burden of proof.

### C.    *Summary Judgment Standard in IDEA Cases*

"[S]ummary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence." *Loren F.,* 349 F.3d at 1313 (quoting *Beth B. v. Van Clay,* 282 F.3d 493, 496 n.2 (7th Cir. 2002)). As such, the court's decision "is better described as [a] judgment on the record." *Id.; see also Walker County,* 203 F.3d at 1297 (describing the IDEA provision for judicial review as "puzzling" and "somewhat confusing" and questioning the proper mechanism, but declining to decide the issue because it was not squarely presented on appeal). Thus, Rule 56 summary judgment principles do not apply in IDEA cases. *See Loren F.,* 349 F.3d at 1313. A judgment on the record is "simply a procedural vehicle requiring [the court] to decide . . . [the IDEA] action on the basis of the administrative record." *Id.* at 1313 n.4 (quoting *Suzawith v. Green Bay Area Sch. Dist.,* 132 F. Supp. 2d 718, 724 (E.D. Wis. 2000)). Hence, nothing prevents judges "from factfinding under Fed. R. Civ. P. 52 in IDEA cases—even on a record bearing evidence tendered in addition to the IDEA administrative record—subject to the requirement that they accord 'due weight' to the administrative findings." *Id.* at 1313-14.

Contrary to the Parents' argument in the Parents' Consolidated Reply, the Board has not invoked a Fed. R. Civ. P. 12(c) judgment on the pleadings and, moreover, Fed. R. Civ. P. 56 summary judgment standards do not apply. The confusion is understandable given the uncertainty as to the appropriate procedural mechanism for presenting IDEA judicial review cases to a court for final disposition. But because the Parents' own Proposed Order requests the Court to make a *de novo* review on the administrative record, it should be treated as a motion for judgment on the record just like the Board's filing. Therefore, the Court will proceed accordingly. In the event that we need to make more specific, or supplemental, factfindings, thus making a judgment on the record inappropriate, we could conduct a bench

trial to resolve disputed issues of fact that cannot be addressed via pre-trial dispositive motions. *See Loren F.,* 349 F.3d at 1313, 1318. The parties have not requested supplemental factfinding and we find no reason to conduct a bench trial in this case. The facts developed before the ALJ will form the basis of this decision but with appropriate *de novo* review to consider whether the ALJ reached the appropriate legal conclusions under the IDEA.

### III.   ANALYSIS

#### A.   *Overview of Issues in Dispute*

The Parents claim the Board violated the IDEA's procedural requirements, preventing full and effective parental participation in the decision-making process to determine the appropriate educational needs, services, and placement for O.L., by: (1) failing to timely provide all of O.L.'s educational records; (2) failing to timely provide appropriate responses to the Parents' requests for PWNs; (3) predetermining placement at PSHS and the level of services O.L. would receive without meaningful discussion; and (4) failing to consider parental input. [Parents' Proposed Order, pp. 2, 9, 10, 11, 13, 15]. The Parents also seek review of the ALJ's finding that PSHS was an appropriate setting for O.L.'s needs and assert the Board failed to implement the IEP in the LRE. [Parents' Proposed Order, pp. 2, 17].

The Parents further claim they are entitled to compensatory educational expenses because the Board failed to provide appropriate services for O.L., requiring them to incur educational related expenses in hiring professionals to provide educational and related services to O.L. [Parents' Proposed Order, p. 18]. Likewise, the Parents claim they are entitled to reasonable attorney's fees and costs because they prevailed at the due process hearing before the ALJ. [Parents' Response, p. 20]. However, the Parents request that their compensatory educational expenses and reasonable attorney's fees and costs claims, along with their claim for civil rights violation in Count 3 of their Complaint [DE 1], be stayed

pending the Court's decision on the merits of their complaint and an evidentiary hearing. [Parents' Response, p. 20 & n.43].

The Board responds that the Parents are not entitled to relief because the Board did not violate any procedural safeguards under the IDEA and because PSHS is an appropriate placement for O.L. [Board's Motion, DE 23, p. 2]. The Board also claims the Parents are not entitled to reimbursement for compensatory educational expenses because the IEP significantly provided O.L. with a FAPE. *Id.* Also the Board adds that the Parents are not entitled to attorney's fees because they did not prevail on any significant claim for relief raised in the administrative proceeding and have not proffered evidence on the issue. *Id.*

Neither party challenges the ALJ's finding that the IEP deprives O.L. of a FAPE by failing to adequately address O.L.'s educational needs: (1) arising from his illnesses and disorders; and (2) in reading, specifically, reading comprehension. [Parents' Proposed Order, p.12; Board's Motion, DE 23, p. 2; Board's Consolidated Response, p. 18]. Thus, the Court need not address these issues and adopts the ALJ's findings as conclusive, and agrees that any damage or fee determinations should be resolved at a later stage of the case.

### B.   *Review of Procedural Issues*

The Parents first allege that the Board violated the IDEA's procedural requirements, preventing full and effective parental participation in the decision-making process to determin the appropriate educational needs, services, and placement for O.L. [Parents' Proposed Order, p. 9]. The Board allegedly: (1) failed to timely provide all of O.L.'s educational records; (2) failed to timely provide appropriate responses to the Parents' requests for PWNs; (3) predetermined placement at PSHS and the level of services O.L. would receive without meaningful discussion; and (4) failed to consider parental input. [Parents' Proposed Order, pp. 2, 9, 10, 11, 13, 15].

The Board responds that it did not violate the Parents' procedural safeguards under the IDEA. [Board's Motion, DE 23, p. 2]. The Board notes that the ALJ stated the Parents' claims of procedural violations do not rise to the level of procedural due process violations under the IDEA and that there is no evidence of a material violation of any procedural requirement. [Board's Motion, DE 25, pp. 14-15; Board's Consolidated Response, p. 3]. Hence, the Board contends the Parents are not entitled to relief. [Board's Motion, DE 23, p. 2]. The Court agrees but with one important exception relating to the Board's predetermination that O.L. be placed only at PSHS.

### 1.  *Educational Records*

The Parents initially claim the Board failed to timely provide all of O.L.'s educational records, evidenced by the ALJ finding it obvious the Board failed to produce all of the records, despite several waves of production. [Parents' Proposed Order, p. 10; Parents' Response, p. 11]. The Parents, contrary to the ALJ's findings, argue that the Board's failure to produce records was not immaterial. [Parents' Proposed Order, pp. 10-11; Parents' Response, pp. 11-12].

Moreover, the Parents argue that, although the ALJ found the Board's failure to produce the Woodcock Johnson reading comprehension test ("WJRC test") as immaterial because the IEP team had ample evidence that O.L.'s reading had not improved for several years, the same IEP team continued to prepare an inadequate IEP for reading. [Parents' Proposed Order, pp. 10-11; Parents' Response, pp. 11-12]. Thus, the Parents reason the Board's failure to produce the WJRC test data compromised the level of services provided to O.L., resulting in a deprivation of educational benefit to O.L. and a denial of procedural due process to the Parents. *Id.*

On the other hand, the Board insists that educational records were made available to the Parents and that there is no evidence suggesting an intentional failure to produce records and that any omissions were harmless.  [Board's Motion, DE 25, p. 14].  The Board adds that, although the ALJ did note the Board failed to produce all of the records despite several waves of production, the ALJ proceeded to find:

> [N]o evidence suggests that [the Board] intentionally or recklessly failed to produce documents.  Few records among the thousands of documents were tardily produced or lost.  Most importantly, [the Parents have] identified no omitted records that would have been material to the issued presented in this case, including the responsibility of [the Board] to provide [O.L.] with a [FAPE].

[Board's Consolidated Response, p. 4 (citing FO ¶ 108)].  The Board concludes the ALJ found the omitted WJRC test results did not provide any new information that would have informed the IEP team beyond what it already knew from O.L.'s file, noting that the Parents fail to point to any testimony or explain how the results would have further informed or impacted the IEP team or caused a deprivation of educational benefit to O.L.  [Board's Consolidated Response, p. 5].

Although the Board admittedly failed to provide all educational records to the Parents, we find that the Board's failure to produce such records was not material.  While it is true that the IEP team failed to develop an adequate IEP for reading, the Parents do not point to any evidence indicating that, had the IEP team been aware of the WJRC test results, they would have developed a different IEP for reading, much less one the ALJ or the Court would have found adequate.  Ample evidence in this record shows that O.L.'s reading had not improved for several years.  As the ALJ found, even though the WJRC test results would have further demonstrated O.L.'s deficiencies in reading, it would not have provided the IEP team with any new information they did not already have.  [FO ¶ 107].  Consequently, though the Board

failed to provide the WJRC test results, because no prejudice or actual harm resulted from such a failure, no relief may be granted. *See Doe,* 915 F.2d at 661-62; *Weiss,* 141 F.3d at 994.

The Parents also insist the Board's failure to disclose Ms. Burnham's letter, containing a recommendation contrary to PSHS, to the IEP team and the Parents was material. [Parents' Proposed Order, p. 11; Parents' Response, p. 12]. The Parents suggest that a reasonable inference is that Ms. Grandchamp's failure to disclose the letter was intentional. [Parents' Response, p. 12]. The ALJ, however, found Ms. Burnham's letter lacked any force and it was irrelevant if the IEP team saw it. [Board's Consolidated Response, p. 6]. The Board argues that the Parents fail to explain how the omission of the letter resulted in a harm to O.L. and do not point to any IEP member's testimony indicating a recommendation for a change in placement had Ms. Burnham's letter been produced. [Board's Consolidated Response, p. 7].

The Parents' argument that the Board's failure to disclose Ms. Burnham's letter was material lacks merit. The Parents point to no evidence demonstrating that the production of the letter – as opposed to other evidence already in the record – would have resulted in a change from placement at PSHS. The Court does not find it a reasonable inference that Ms. Grandchamp intentionally failed to produce the letter to the IEP team and the Parents. Although the ALJ found it to be unclear why the letter did not reach the IEP team, it is possible this occurred because Ms. Burnham did not submit it after the assistant principal for ESE advised her not to do so. The ALJ noted, and the Court agrees, that "no evidence suggests that [the Board] intentionally or recklessly failed to produce documents." [FO ¶ 109]. The Parents point to no evidence or testimony indicating otherwise. Thus, because the Parents have not established that the Board's failure to produce Ms. Burnham's letter resulted in prejudice or actual harm to O.L., relief may not be granted. *See Doe,* 915 F.2d at 661-62; *Weiss,* 141 F.3d at 994.

Finally, the Parents also insist therapy records, status reports, reading data, autism support records, and scantron forms were allegedly kept, but not produced, indicating they demanded records before and after the IEP meetings.  [Parents' Proposed Order, pp. 10-11; Parents' Response, pp. 11-12].  The Parents allege S.L. specifically requested the Board advise her of all of the types and locations of O.L.'s educational records, but no evidence was submitted showing the Board complied with the request.  [Parents' Proposed Order, p. 10 n.26; Parents' Response p. 11 n.33].

The Board counters that the Parents fail to explain how therapy records status reports, reading data, autism support records and scantron forms resulted in harm to O.L.  [Board's Consolidated Response, p. 7].  The Board states the ALJ did not find any omission of records to be material based on: the Board's stipulation that it initially missed some sensory and motor integration evaluations and a therapy chart, but provided them once identified; no observations and support logs were in existence because the personnel who were supposed to be maintaining them were not; the fluency practice graph was kept in the classroom by O.L.; and information from a missing data entry form regarding receipt of counseling services was keyed into the system and was provided.  [Board's Consolidated Response, pp. 7-8].

The mere fact that the Board did not produce therapy records, status reports, reading data, autism support records, scantron forms, other records related to O.L.'s education, and the location of such records is insufficient to warrant relief if no actual harm or prejudice occurred as a result of the procedural violation.  *See Doe,* 915 F.2d at 661-62; *Weiss,* 141 F.3d at 994.  The Parents have not established that the Board's failure to produce such records resulted in prejudice or actual harm to O.L.  The Court agrees with the ALJ that the Parents have "identified no omitted records that would [be] material to the issues presented in this case. . . ."  [FO ¶ 109].  Thus, no relief may be granted.

Although the Parents rely on Fla. Admin. Code R. 6A-6.0311(4)(c), asserting that the Board must notify the Parents if any educational records are destroyed, Rule 6A-6.0311 contains no section (4) or (4)(c). [Parents' Proposed Order, p. 10 n.26; Parents' Response, p. 11 n.33.] Additionally, Fla. Stat. § 1001.52 requires that personally identifiable information pertaining to a child, when no longer needed to provide educational services, must be destroyed at the request of the parents. Section 1001.52 does not require a board to notify parents if such records are destroyed without a request from the parents. Thus, there is simply no merit to the Parents' argument that the Board is required to notify the Parents if it destroyed O.L.'s educational records.

Accordingly, the Court finds that the Board did not violate the IDEA's procedural requirements with regard to the production of educational records.

### 2. *Requests for Prior Written Notices ("PWN")*

The Parents next claim the Board failed to timely provide appropriate responses to their requests for PWNs. [Parents' Proposed Order, pp. 11-12; Parents' Response, p. 13]. Specifically, the Parents indicate the Board failed to provide appropriate responses when: (1) requests for classroom observations were refused; (2) the Parents requested listings of types and locations of all educational records maintained by the Board and titles and addresses of officials responsible for such records; (3) the Parents requested changes to the IEP; and (4) the Board proposed changing O.L.'s educational placement. [Parents' Proposed Order, p. 12; Parents' Response, p. 13]. The Parents allege the Board failed to provide a description of any other options the Board considered and the reasons why those options were rejected. [Parents' Proposed Order, p. 12; Parents' Response, p. 13].

The Board responds that the Parents only raised the issue of PWNs with regard to proposals or refusals in the IEP meetings from July 13 to September 26, 2006, meetings the

ALJ did not address.  [Board's Consolidated Response, pp. 9-11].  The Board asserts the ALJ did not issue findings on PWN claims and, thus, the Parents have failed to exhaust administrative remedies and are precluded from raising PWN claims now.  [Board's Consolidated Response, p. 11].

The Parents insist they filed a specific list of claims they desired to pursue in response to the Board's request for a due process hearing, of which a PWN claim for requested changes to the IEP was included.  [Parents' Consolidated Reply, p. 3].  The Parents note that at the hearing, upon the Parents' request for the ALJ to affirm they exhausted all administrative remedies, counsel for the Board stated: "We will not in any way, shape or form in the future say you did not exhaust administrative remedies, we will defend the case on other grounds, but not on that."  [Parents' Consolidated Reply, pp. 3-4; Tr., 1084:16-22].

The Parents specifically raised the Board's failure to provide timely appropriate PWNs as an issue in their complaint to the ALJ.  [DE 10, p. 40, ¶ C.1.e.; p. 41, D.3.a.(1)(a)[4]].  During the hearing, the ALJ ruled it would only hear evidence on the Board's failure to provide timely appropriate PWNs that pertain to the May 22 IEP and that evidence relating to subsequent IEPs are irrelevant.  [Tr., 9:24-22:15].  Although the Board quotes the Parents—four times—as only raising the issue of PWNs in their due process complaint with regard to "proposals or refusals in the IEP meetings from July 13 to September 26, 2006" it did not provide a citation for the quote.  [Board's Consolidated Response, pp. 9-11].  After searching the Parents' complaints, the Court was unable to locate such quoted language.[13]

---

[13]Note, the Court is under no duty to comb through the voluminous record to locate the claim made by the Board.  *See generally Dunsizer v. Crosby,* 2006 U.S. Dist. LEXIS 10993, at*21 (M.D. Fla. Mar. 2, 2006) ("The Court is under no obligation to search through the record to find support for a claim made by [a party]."); *Finestone v. Fla. Power & Light Co.,* 2006 U.S. Dist. LEXIS 7743, at *37 n.16 (S.D. Fla. Jan. 5, 2006) ("[T]he Court is not under an obligation to search a voluminous record to verify record citations.").

Although the ALJ notes the Parents' PWN claim in its Final Order, it did not make any specific findings other than holding that there is no evidence of a material violation of any procedural requirements.  [FO p. 5; ¶174].  Thus, the Board's position is not supported by the record.  The Parents have exhausted all administrative remedies.

The Board then suggests, citing to *Buser v. Corpus Christi Indep. Sch.,* 51 F.3d 490 493-94 (5th Cir. 1995), that "where parents are notified of the annual IEP meetings, given the opportunity to compare previous IEPs with the new proposed IEP, and to participate in the development of the new IEP, the school district adequately complies with the notice requirement under the IDEA."  [Board's Consolidated Response, pp. 8-9].  However, in *Buser,* the parents argued the school board violated the IDEA because it failed to notify them of annual IEP meetings  which the parents participated in.  51 F.3d at 493-94.  What *Buser* held, contrary to the Board's assertion, was that where parents are notified of the annual meetings, given the opportunity to compare previous IEPs with the new proposed IEP, and are allowed to participate in the development of the new IEP, the school board complies with the notice requirement under the IDEA *that parents be notified of an IEP meeting.  Id.* at 493-94.  Thus, because the Parents do not allege the Board failed to notify them of an IEP meeting, the Board's assertion that no procedural violation occurred because the Parents were notified of, attended, and provided input at every IEP meeting has no bearing.

Nevertheless, it is also true that PWNs are not required for classroom observations or the types and locations of all educational records, and titles and addresses of officials responsible for such records, because these requests do not constitute a proposal or refusal to initiate or change the identification, evaluation, or educational placement of O.L.  [Board's Consolidated Response, pp. 9-10].  Even if the Parents' requests did require a PWN, the Parents did not provide the Court with any evidence to determine whether the Board provided

timely appropriate responses.[14]  Thus, in the end, no procedural violation occurred for failure to provide timely appropriate PWNs for classroom observations or types and locations of all educational records maintained by the Board and titles and addresses of officials responsible for such records.

The Board also makes the same claim with respect to the Parents' requested changes to the IEP, stating these requests do not constitute a proposal or refusal to initiate or change the identification, evaluation, or educational placement of O.L.   [Board's Consolidated Response, p. 10].  However, a PWN is required for requested changes to the IEP, as it relates to the Board's refusal to change the identification, evaluation, or educational placement of O.L. *See* 34 C.F.R. § 300.503(a).

Again, however, the Board provided the Parents with fifty-nine PWNs upon the completion of the May 2006 IEP for their requested changes and for the Board's proposed change to O.L.'s educational placement.  [Board's Motion, DE 25, p. 14;  Board's Consolidated Response, p. 10-11].  Upon review of the documents cited by both parties, which relate to the May 22 IEP, the evidence demonstrates the Board provided the Parents with PWNs for their requested changes and for the Board's proposed change to O.L.'s educational placement, all of which address the seven requirements provided in 34 C.F.R. § 300.503(b).  The Parents' contention, that the Board failed to provide a description of any other options that it

_____

[14]Although the Parents cite to Resp. Ex. H-88, 89, 91, 98, 116, 126, 132, 133, & 162, the documents referenced in these pages could not be located.  While the voluminous Exhibit H contains bates stamped numbers, which are not in order, neither of the pages references were located as a bates stamped number.  The Court attempted locating the 88th, 89th, etc., page within Exhibit H, but the documents in those locations do not correspond to the information the Parents cited to.  Again, it is not the Court's duty to comb through the plethora of pages in Exhibit H to guess whether a document contained within relates to the information the Parents cite to.  *See generally Finestone,* 2006 U.S. Dist. LEXIS 7743, at *37 n.16 ("[T]he Court is not under an obligation to search a voluminous record to verify record citations."); *Dunsizer,* 2006 U.S. Dist. LEXIS 10993, at*21 ("The Court is under no obligation to search through the record to find support for a claim made by [a party].").

considered and the reasons why those options were rejected, lacks merit.  The Board did not leave this section of the PWN blank, but merely stated that no other options were considered. Sections 300.503(b) does not demand that a school board consider other options, but simply requires it to describe the other options that were considered, if any exist.  Therefore, no procedural violation occurred for failure to provide timely appropriate PWNs for the Parents' requested changes to the IEP or for the Board's proposed change to O.L.'s educational placement.

### 3.   Predetermination

The Parents claim here that the Board predetermined O.L.'s placement at PSHS and the level of services O.L. would receive without meaningful discussion.  [Parents' Proposed Order, p. 13; Parents' Response, pp. 13-14].  The Parents assert that the most important aspects of O.L.'s IEP were a "done deal" when the Parents entered into the IEP meeting and that the Board made a unilateral decision regarding O.L.'s placement, contrary to his best interests.  [Parents' Proposed Order, p. 13].  The Parents insist the Board never considered anything but PSHS as a viable option and that the most important aspects of O.L.'s IEP, such as placement and the level of services, were a "done deal" when the Parents entered into the IEP meetings.  [Parents' Proposed Order, p. 13; Parents' Response, p. 14].  Thus, the Parents allege the Board made a unilateral decision to place O.L. at PSHS, contrary to his best interests.  [Parents' Proposed Order, p. 13].

The Board responds that the Parents did not include a claim that the Board predetermined the level of services O.L. would receive in either their complaint or their underlying due process complaint and, thus, the ALJ did not issue findings on this claim. [Board's Consolidated Response, p. 13]. The Board reasons that the Parents failed to exhaust administrative remedies and are precluded from raising the claim now.  *Id.*

The Parents reply that they filed a specific list of claims they desired to pursue in response to the Board's request for a due process hearing, of which a claim that the Board predetermined placement at PSHS and the level of services O.L. would receive was included. [Parents' Consolidated Reply, p. 3]. The Parents add that the Board objected to such efforts, which the ALJ sustained and thus they exhausted all administrative remedies. *Id.* The Parents note that at the hearing, upon their request for the ALJ to affirm they exhausted all administrative remedies, counsel for the Board stated: "We will not in any way, shape or form in the future say you did not exhaust administrative remedies, we will defend the case on other grounds, but not on that." [Parents' Consolidated Reply, pp.3-4; Tr., 1084:16-22].

Although the Parents failed to specifically raise predetermination as an issue in their complaint to the ALJ, the Parents did state they sought to address "all of their issues pursuant to . . . 34 C.F.R. § 300.001 *et seq.*"[15] [DE 10, pp. 40-41 ¶ D.2.e.]. The Parents raised the issue of predetermination in their opening statement. And, in their Proposed Final Order to the ALJ, they emphasized that the issue was before the ALJ and presented an analysis. [Tr., 47:8-23; DE 10, pp. 210, 265-66]. The Board also argued predetermination in its Proposed Final Order to the ALJ, noting that it was the Parents who predetermined the appropriate placement for O.L. to be MAST Academy and not PSHS. [DE 10, p. 194 ¶¶ 20-21].

We find that, while the ALJ may have had reason to question whether the issue of predetermination was adequately raised below, given the fact that the ALJ made a finding of fact on predetermination, and contrary to the Board's argument below, the Court finds that the Parents have exhausted their administrative remedies. [FO ¶ 107].

---

[15]Within 34 C.F.R. § 300.001 is § 300.115(b)(1), which relates to predetermination of placement.

Turning to the merits of the issue, the Parents note that, although the ALJ believed the lack of discussion about MAST Academy and its characteristics was not material if members of the IEP examined the documents submitted by the Parents, no evidence exists that Dr. Sasseville discussed the information provided by the Parents with other IEP team members. [Parents' Proposed Order, p. 13; Parents' Response, p. 14]. Because the IEP does not include these recommendations, a reasonable inference is that it was not discussed. *Id.* And the Parents suggest that, because IEP objectives must be written prior to the determination of placement, the Board's decision to place O.L. at PSHS prior to developing an IEP on which to base that placement violates the IDEA. [Parents' Proposed Order, p. 15; Parents' Response, p. 15].

The Board contends that the Parents fail to point to a preponderance of the evidence that their desired school setting for O.L. was not considered and notes that correspondence exists between the Parents and the Board on issues that concerned the Parents prior to and after the IEP meetings. [Board's Consolidated Response, p. 12]. While the Board asserts that placement was not predetermined, it indicates that the decision to place O.L. in a *separate class* was determined at the IEP meetings with the Parents' participation, but not his placement at *PSHS*. [Board's Consolidated Response, pp. 12-13]. Although the IEP team chose the school setting in advance of the IEP, the decision was purportedly based on the team's belief that O.L.'s needs could be met at PSHS and there was no need to consider other school locations. [Board's Consolidated Response, p. 15]. The Board also alleges that the IEP team made a final decision in advance of an IEP to avoid "the [P]arent's [sic] preclusion from meaningful participation in the decision making process." *Id.*

The ALJ found, however, that before the end of the planning process before the IEP was completed the IEP team decided upon PSHS as the educational setting for O.L. [FO ¶ 112].

Yet the ALJ also found that, while Ms. Grandchamp stated no other educational site would be considered, this was not an indication that the IEP team had not in fact considered any other site. *Id.* To support it's view, the ALJ noted that Ms. Grandchamp allowed someone from MAST Academy to make a presentation to the IEP team, though she did not allow a discussion to follow. *Id.* The ALJ thus found that, while a "setting is typically selected at the end of the planning process, [] selecting it earlier does not mean that the IEP team failed to consider other potentially appropriate settings." *Id.*

But because the school site is an essential aspect of placement, *see infra* at 48-49, there can be no question under the IDEA that the decision to place O.L. at PSHS must have also been determined at the IEP meetings with the Parents' participation. It is true that it is possible that the IEP team considered other potentially appropriate settings, though Ms. Grandchamp's refusal to allow any discussion following the MAST Academy presentation raises real doubts as to that. In any event, the record conclusively shows, given that O.L.'s educational setting was selected at the May 16 IEP meeting well before the end of the planning process and before his IEP was completed, that the Board undoubtedly violated the procedural safeguards provided in 34 C.F.R. § 300.116(b)(2), whether or not other educational settings were considered at that time.

Section 300.116(b)(2) specifically states that, to comply with the procedural requirements of the IDEA, a child's placement must be based on the child's IEP. In order to base the placement of a child on an IEP, the IEP must be fully developed. If placement is determined prior to the development of the child's IEP, the placement could not have been based on the IEP, resulting in a fundamental violation of the IDEA. Furthermore, the Board decision to place O.L. at PSHS in advance of an IEP, to avoid the Parents' preclusion from meaningful participation in the decision making process, does not justify the procedural

violation.  Rather, it squarely supports the Parents' allegation that the Board was preventing the Parents from participating in the decision making process.  A school system is statutorily obligated to consult with a child's parents before choosing placement to prevent school officials from making a unilateral and final decision on the placement of the child.  *See Honig,* 484 U.S. at 321; *see also M.M.,* 437 F.3d at 1096 ("full parental involvement is the purpose of many of the IDEA's procedural requirements").

Consequently, the Board's decision to place O.L. at PSHS prior to developing an IEP upon which to base that placement is a procedural violation of the IDEA.  The Board's decision to determine placement at PSHS before the development of O.L.'s IEP shows that PSHS was not selected because it was the appropriate setting in which to implement the IEP and that would provide him with an educational benefit.

The IDEA was violated as a result.  *See, e.g., Deal v. Hamilton County Bd. of Educ.,* 392 F.3d 840, 856-59 (6th Cir. 2004) (holding that parents met burden of showing procedural violation from predetermination; school board's policy-driven placement decision was not based on child's IEP); *Spielberg ex rel. Spielberg v. Henrico County Pub. Schs.,* 853 F.2d 256, 259 (4th Cir. 1988) (applying predecessor IDEA statute and regulations and holding that school board committed procedural violation by predetermining student's placement before developing an IEP; "[placement predetermination] violates the spirit and intent of the [statute], which emphasizes parental involvement.  After the fact involvement is not enough.").

Had the IEP team revisited its decision to place O.L. at PSHS after the IEP had been fully developed, the argument could have been raised that the Board cured its procedural violation.  The Fact that the Board did not revisit placement at PSHS evidences material prejudice to the Parents, for which the Court has no alternative but to grant relief because the Board did not comply with the basic procedures set for in the IDEA.  *See Rowley,* 458 U.S. at

2006; *see, e.g., Deal,* 392 F.3d at 858 ("The clear implication is that no matter how strong the evidence presented by the [parents], the School System still would have refused to provide the services. This is predetermination."); *see also Doe,* 915 F.2d at 661-62; *Weiss,* 141 F.3d at 994.

Accordingly, the Court finds in this instance that the Board violated the IDEA's procedural requirements with regard to predetermination. On remand, based on this procedural violation alone, the Board must be ordered to review once again the placement question and determine the appropriate school site based on O.L.'s IEP (as supplemented by the ALJ's and this Court's findings).

### 4. *Parental Participation and Input*

The Parents finally claim the Board violated the procedural requirement of the IDEA when it failed to consider parental input in the decision making process. [Parents' Proposed Order, p. 13; Parents' Response, pp. 13-14]. The Parents assert that most of their requests were "deferred until later," but were never addressed and that the Board allowed little to no discussion the few times they were permitted to speak. [Parents' Response, p. 14]. The Parents thus reason that the procedural violations rose to the level of depriving the Parents of meaningful participation in the IEP processes, causing substantive harm and depriving O.L. of a FAPE. [Parents' Proposed Order, p. 15; Parents' Response, p. 15].

The Board responds that the Parents and their representatives were indeed active participants in the IEP process. [Board's Consolidated Response, p. 16]. O.L.'s private therapist, Ms. Lara, spoke extensively to the IEP team and discussed matters with the team, as well as the school's occupational therapist. *Id.* The Parents also had a representative from MAST Academy give a presentation to the IEP team. *Id.* The Board states that, although the meeting was run firmly, the IEP team discussed "limited matters" with the Parents. *Id.* The Board notes the ALJ's finding that the substantive deficiencies in the IEP did not mean the

planning process was necessarily flawed, asserting that the Parents attended and recorded all of the IEP meetings, fully participated, provided considerable input at every IEP meeting, provided a high volume of correspondence to the Board, and that the IEP team considered various issues related to O.L.'s education. [Board's Consolidated Response, pp. 17-18].

During the IEP development process, parental involvement is critical and is the purpose of many of the IDEA's procedural requirements. *See M.M.,* 437 F.3d 1095-96. The record shows that the Parents attended the entire IEP meeting, throughout which they presented various concerns for the IEP team to address. The Parents' representatives were allowed to present issues to the IEP team and discuss various matters related to O.L.'s education. Although Ms. Grandchamp did say that the IEP team would not discuss the setting of MAST Academy, the Parents were still allowed to have a representative from MAST Academy give a presentation. Additionally, as the ALJ found, nothing required the Board to structure the IEP discussion by focusing on the setting of MAST Academy. [FO ¶ 99]. Hence, the refusal to discuss MAST Academy after the presentation was not a procedural failure to permit the Parents to participate in the IEP process.

Likewise, while little to no discussion was allowed for other issues, related documents produced by the Parents were in the record and were available to the IEP team. Ms. Lara also spoke to the IEP team and discussed various issues related to O.L.'s sensory overload. Though Ms. Grandchamp did not allow the Parents to insert issues she did not want addressed during the May 22, 2006 IEP meeting, as the ALJ found, this deficiency does not mean that the planning process was necessarily flawed, as they were allowed to participate in the topics presented. [FO ¶ 114]. Consequently, the Board did generally consider parental input in the decision making process and the Parents were given meaningful participation. Thus, there

was no procedural violation in this respect, although there was such a violation on the narrower question of predetermination of the school placement decision.

Accordingly, the Court finds that the Board did not violate the IDEA's procedural requirements with regard to parental participation and input.

**C.    _Substantive Review of School Setting Determination_**

### 1.    *MAST Academy Setting*

The Parents' primary substantive argument relates to the Board's decision to place O.L. at PSHS, rather than the preferred school site advocated by the Parents.  They note the collective and independent professional opinions of O.L.'s treating physicians, evaluators, therapists, advocates, and the Board's own employees who had direct knowledge of PSHS and MAST Academy, as well as themselves, is that a smaller school and low density setting that is not physically or emotionally overwhelming, such as existed when O.L. was in elementary school, is necessary for O.L. to receive an educational benefit.  [Parents' Proposed Order, p. 14; Parents' Response, p. 8].  The Parents argue these opinions deserve great weight, contrary to that given by the ALJ.  [Parents' Proposed Order, pp. 14-15; Parents' Response, pp. 8-9]. The Parents add that they, as well as other professionals and teachers, propose a smaller educational environment as appropriate to O.L.'s needs; MAST Academy is an environment of which its characteristics are promoted, rather than the specific facility itself.  [Parents' Response, p. 19].

Before addressing the merits of the Parents' argument, citing to *White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379-80 (5th Cir. 2003), the Board first responds that because educational placement means educational *program*, as opposed to a particular institution where the program is implemented, the Parents may not challenge the school site one way or the other.  [Board's Motion, DE 25, pp. 17-18; Board's Consolidated Response, pp. 12-13].  In

*White,* the Court addressed a case in which the parents sought to require the school district to place their deaf child in a mainstream classroom in a neighborhood school. 343 F.3d at 379. The Court held that the parents did not have a right under the IDEA to participate in site selection, because the term "educational placement" did not refer to a place, but to a program of services. *Id.* at 379-80.

But in this case, if placement at PSHS is found to be an inappropriate setting for O.L., the Board would be offering essentially the same program of services as determined by the ALJ, which neither party challenges now, but at a different school site. All of the services in O.L.'s IEP, along with the changes made by the ALJ, will continue to be implemented. This change is far more minimal than that involved in *White,* where a change in the school site would have required a change to the services provided in the child's IEP. *See id.* at 376.

Moreover, a parent's substantive right to challenge the school site where the child's IEP is to be implemented is a challenge affirmatively encouraged by the overall philosophy expressed in the IDEA. *See In re Educ. Assignment of Joseph R.,* 2007 U.S. Dist. LEXIS 33070 (E.D. Pa. 2007). Given that 34 C.F.R. § 300.115(b)(1) specifically defines placement as "*instruction in* regular classes, special classes, *special schools, home instruction,* and *instruction in hospitals and institutions,*" the definition implies that a particular school setting and location where instruction is given is an aspect of placement (emphasis added). Furthermore, 34 C.F.R. § 300.116(b)(3) requires that placement be "as close as possible to the child's home," which refers to placement as a specific location. "In light of the fact that the school at which special education services are expected to be provided can determine the appropriateness of an education plan, it stands to reason that [the school site] can be a critical element for the IEP to address." *A.K. v. Alexandria City Sch. Bd.,* 484 F.3d 672, 680 (4th Cir. 2007); *see* Paolo Annino, *The 1997 Amendments to the IDEA: Improving the Quality of Special*

*Education for Children with Disabilities,* 23 Mental & Physical Disability L. Rep. 125, 126 (Jan./Feb. 1999) (noting the requirement that an IEP identify the location at which special education is expected to be provided reflects the fact that "[a]ll schools and classes are not uniform"). *But see White,* 343 F.3d at 379 (holding "[t]he provision that requires the IEP to specify the location is primarily administrative").

Thus, the Court finds that under the IDEA the Parents have a substantive right to challenge the particular school site where the IEP is to be implemented. The Parents' right to appeal the ALJ's decision upholding the Board's placement determination is an important procedural safeguard the IDEA provides. *See* 20 U.S.C. §§ 1415(g), (i)(2); *see also CP v. Leon County Sch. Bd.,* 483 F.3d 1151, 1153 (11th Cir. 2007); *E.W. v. Sch. Bd. of Miami-Dade County Fla.,* 307 F. Supp. 2d 1363, 1370 (S.D. Fla. 2004). We note, however, that although a court can determine whether a particular placement as identified in an IEP is appropriate or not, it has no authority to direct any particular placement. *See J.M.,* 957 F. Supp. at 1259 n.4.

Turning to the merits of the issue, the Board points out that the ALJ assigned little weight to the shared opinion of the Parents' professional witnesses because their "testimony required educational expertise that they did not have;" they failed to "differentiate between schools of several hundred students and schools with a few hundred more students;" no witness "attempted an analysis of student density at a school, . . . [but] instead made a simplistic assumption about the relationship of the size of the school and the intensity of environmental stimuli;" and they "failed to address the myriad of variables that would need to be considered carefully to assess the stimulatory potential of a school setting." [Board's Consolidated Response, p. 14 (quoting FO ¶¶ 196-97); Board's Motion, DE 25, pp. 18-19]. The Board suggests O.L. could benefit educationally in a larger setting and notes that none of the

Parents' professionals could isolate school size as the sole or primary factor affecting O.L.'s stress levels.  [Board's Motion, DE 25, p. 18; Board's Consolidated Response, p. 14].

Although it is true that many of the Parents' professionals witnesses do not have educational expertise, those witnesses who lack experience in education have substantial proficiency in dealing with O.L. and his disabilities, as well as other autistic children with similar disabilities to that of O.L.  This proficiency with O.L.'s disabilities enables the Parents' professionals to render an accurate opinion regarding what O.L. requires in his educational environment to allow him to access his education.

Nevertheless, the Court agrees with the ALJ that the testimony of the Parents' professionals was lacking in several areas, at least with respect to the Parents' primary argument that O.L. could only be placed at a school with less than 700 students.  These professionals failed to differentiate between schools of several hundred students and schools with a few hundred more and neglected to include an analysis of student density at a school, such as the number of students and the effective area of the school, instead making an assumption about the relationship between the size of the school and the intensity of environmental stimuli without any factual support.  Likewise, no witness addressed the multitude of variables that must be considered to carefully assess the stimulatory potential of a particular school setting.

Although the Parents' professionals relied on O.L.'s success in elementary  school to support their view for a more elementary school-type setting, the professionals omitted an analysis on the relationship between the much more demanding nature and the stress O.L. experienced while enrolled in secondary school.  Consequently, the Court agrees with the ALJ that any reliance on O.L.'s success in modulating sensory input in smaller elementary schools fails to account for the nature of elementary schools, which is more emotionally supportive and

less intellectually and socially demanding than middle or high school.  Therefore, the evidence does not support a finding that a FAPE absolutely requires the educational setting of MAST Academy or similar school setting with less than 700 students.[16]

## 2.  Placement at PSHS

At the same time, it must be acknowledged that, based on this record, while the Parents' professional witnesses could not isolate school size as the sole or primary factor affecting O.L.'s stress levels, school size is clearly one of the many factors that has an impact on O.L.'s disabilities.  As a result, the Parents also seek review of the merits behind the ALJ's finding that PSHS was the appropriate setting for O.L.'s needs, arguing the Board failed to implement a program that was reasonably calculated to provide any educational benefit to O.L.  [Parents' Proposed Order, pp. 2, 17;  Parents' Response, p. 18].  The Parents argue that, after attending PSHS for only eleven days, O.L. "was demonstrating severe adverse reactions . . . which could not be resolved through medical interventions, [] was in the educational placement promoted by the Board, [] and was complaining about noise at PSHS. . . ." [Parents' Response, pp. 9 n.30, 18; Parents' Proposed Order, p. 8 ].  The Parents note that O.L. was having difficulty adjusting in the optimum classroom at PSHS while the Board was implementing the IEP in the site it suggested, and the ALJ found, was appropriate.  [Parents'

___

[16]It should be noted that the Board's expert did not actually opine that O.L. should have been placed at PSHS. Dr. Sasseville, the Board's expert, suggested that a hospital/educational setting was more appropriate for O.L.  Although the ALJ did agree with Dr. Sasseville's plan to educate O.L. upon his return to high school, the ALJ indicated that "[a]s unpersuasive as the testimony of [the Parents'] professionals in advocating for a school smaller than 700 students was one aspect of the testimony of Dr. Sasseville," the Board's expert witness, where she advocated for instructional services to be provided in a hospital/educational setting.  [FO ¶ 198].  The ALJ found that "[t]he record offers no support for this departure from the requirements of the [LRE]. . . . [T]o manage [O.L.] and his constellation of symptoms requires functional analysis of him in the targeted setting, which remains a school, not a hospital." [FO ¶¶ 198-199].  The Court agrees in this respect, but adds that it is quite notable that the Board's expert did not directly support the Board's decision to place O.L. at PSHS.

Response, p. 9 n.30].   Consequently, O.L.'s sensory issues were causing him to become overwhelmed and demonstrate illness at PSHS, resulting in his tardiness and requiring him to leave early twice.  [Parents' Response, p. 18].  The Parents add that, unlike O.L.'s teachers, "who did not have the institutional knowledge about O.L.'s sensory needs" and who minimized his behaviors at school, the Parents and O.L.'s professionals were aware of the problems O.L. would be facing if he continued to attend PSHS.  [Parents' Response, p. 19].  The Parents conclude PSHS is not appropriate for O.L.'s unique needs, cannot constitute a positive benefit, and caused harm to O.L., both in classroom and non-classroom activities.  [Parents' Proposed Order, p. 17; Parents' Response, p. 19].

The Board counters that there is no basis to conclude that O.L. did not or would not obtain an educational benefit at PSHS after only eleven days of attendance, citing to *Sch. Bd. of Collier County,* 285 F.3d at 982-83.  [Board's Consolidated Response, p. 19].  In *Sch. Bd. of Collier County,* parents withdrew their child from school after attending classes for only sixteen days.  *Id.* at 979-80.  However, during the child's time at school, the mother aggravated behavior problems associated with the child by helping her complete "in-class" assignments at home and attending school with her, during which time the mother "was generally disrespectful of [the child's] teachers and their attempts at instruction, effectively taking over [the child's] classroom teaching."  *Id.*  The Court found it was "impossible to address the academic progress component of the final *Cypress-Fairbanks*[17] factor, [whether positive academic and non-academic benefits are demonstrated,] because of the extremely short period of time K.C. was in school *and the difficulty in determining 'what effect K.C.'s mother's actions had on K.C.'s progress.'*"  *Id.* at 983 (emphasis added).

---

[17]*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.,* 118 F.3d 245, 253 (5th Cir. 1997).

Although the Court in *Sch. Bd. of Collier County* found, as the Board notes, that an extremely short period of time prevented it from addressing the academic progress of the child, what the Board fails to note is that it was an extremely short period of time *coupled with* the mother's actions that prevented the Court from making an adequate determination on the academic and non-academic benefit.  In this case, even though O.L. was enrolled at PSHS for only eleven days before the Parents withdrew him, O.L.'s performance at PSHS and at home during that period, along with his educational history, provides the Court sufficient evidence to render a decision on the appropriateness of PSHS for O.L.  Furthermore, unlike *Sch. Bd. of Collier County,* there were no intervening issues present during O.L.'s enrollment at PSHS preventing the Court from adequately assessing O.L.'s academic and non-academic benefit. *Sch. Bd. Of Collier County* is thus distinguishable.

While the Board's contention that "ample evidence exists that O.L. suffered medical problems and stress related to school for his entire life" may be true, O.L.'s medical problems and stress are symptoms of his disabilities, a finding clearly established by numerous professionals who have evaluated and treated O.L. for several years.  [Board's Consolidated Response, p. 19].  If O.L. is suffering from stress related to school, and is suffering from medical problems related to stress, one must consider whether the school environment is causing O.L. more stress, thus, aggravating his disabilities and impairing his ability to learn. A similar finding by the ALJ was that the Board must consider what is stressing O.L. and causing common byproducts of symptoms of his disabilities, obvious factors of which include academic load.  [FO ¶ 68].

Though the ALJ supplied findings of facts regarding O.L.'s attendance at PSHS, it did not issue any ultimate findings as to O.L.'s experience at PSHS and whether or not his experience had any bearing on its decision that PSHS provided O.L. with a FAPE.  "Courts

find noteworthy the experience of the child in prior placements, if such experience provides significant evidence that efforts . . . have not succeeded." *D.B. v. Ocean Township Bd. of Educ.,* 985 F. Supp. 457, 497 (D.N.J. 1997).

The IEP was implemented while O.L. attended PSHS for the eleven days, supplementing regular services provided at PSHS, which the IEP team felt were tailored to O.L.'s specific needs.  The supplemental services include, among others: O.L.'s placement in a small classroom with few students for English, math, reading, and study skills; dismissing O.L. three minutes early; assigning preferential seating near the teacher; and having a paraprofessional meet O.L. prior to the start of school in a designated area and accompany him to lunch outside where it was quieter.  [FO ¶¶ 118, 122, 151].  However, these accommodations did not prove to be sufficient.  Although O.L. did not present immediate behavior management issues while at PSHS, the record shows that he displayed some anxiety and sensory overload, such as lowering his head to his desk in fatigue while complaining of a headache and increased head tics on one occasion to the point were Dr. Sasseville was "alarmed."  [FO ¶¶ 34, 100, 158, 162].  O.L.'s behavior at home, however, demonstrates that he was suffering from anxiety and sensory overload, such that an increase to O.L.'s medications could not subside some of his symptoms.  [FO ¶¶ 168-169].  O.L.'s behavior at home included obsessive-compulsive rituals, head tics, headaches, vomiting, and other violent behaviors.  [FO ¶¶ 168, 170].  Even though the staff at PSHS dutifully attempted to shelter O.L. from overstimulation, O.L. complained of the crowding and noise in the auditorium and cafeteria, suggesting they were not successful at keeping O.L. from situations that may cause him anxiety and stress.  [FO ¶¶ 171].

Vast similarities exist between the symptoms O.L. experience in seventh grade, prior to his breakdown in December 2004, to his symptoms during his eleven days at PSHS: he

restarted his obsessive-compulsive behaviors; his head tics had worsened; he was experiencing headaches and vomiting; he was less redirectable and was no longer able to accept limits to his behavior; he engaged in temper tantrums with violent outbursts; and he did poorly at home, despite doing well at school.  [FO ¶¶ 19-21, 23-26, 34, 55, 100, 158, 162, 168-170].  Due to his symptoms in seventh grade, O.L. had twenty-four absences before his withdrawal from school, comparable to his eleven days at PSHS where he left early at least once due to fatigue.  [FO ¶¶ 26, 55, 162].

Dr. Gonzalez persuasively explained a phenomenon where persons could control and internalize a behavior, such as tics and headaches, while in an environment in which they must perform or around others whom they do not know very well, suffer from an overflow of that behavior once they have left that environment to one that is more secure.  Both Dr. Gonzalez and Dr. Gerhardt testified it is not uncommon for children with Asperger's-type syndromes to manifest stress later in time after being in a stressful situation.  Consequently, the fact that O.L. experienced most of his behavioral problems and symptoms at home, rather than at school, does not suggest that he was not experiencing anxiety or sensory overload while at school.  The ALJ credited Dr. Gonzalez's explanation of delayed manifestations of stress and further noted that "when the Parents report at-home signs of overstimulation, [the Board] must credit this information and immediately rearrange [O.L.'s] academic environment to reduce stress. . . ."  [FO ¶¶ 35, 203].

After O.L.'s breakdown in seventh grade, the Board provided homebound instruction for the remainder of the school year, later integrating O.L. back into Palmetto Middle School for the ending of seventh grade and beginning of eighth.  Although the Board attempted a gradual transition, which worked well while O.L. attended four periods in school and two period at home, once O.L. attended all of his classes at Palmetto Middle School, he began

exhibiting similar symptoms.  During this time, O.L. had frequent absences and late arrivals. He was also inattentive and was often tired and laid his head down in class.  Ms. Brizo indicated O.L. made very little progress during eighth grade, attributing his failure to his absences and tardiness.  The ALJ noted that inattentiveness and sleepiness are common symptoms of O.L.'s disabilities and that absences and tardiness are byproducts of those symptoms.  [FO ¶ 68].  The ALJ found that the Board must consider what is stressing O.L. and causing his symptoms and their byproducts.  *Id.*  Thus, although the O.L. performed better while attended four classes in school and two classes at home for eighth grade, once he was fully integrated, O.L. was not able to access his education and did not receive an educational benefit.[18]  *See Rowley,* 458 U.S. at 201.

We acknowledge that some of this same record evidence was not enough for the ALJ, or this Court, to find that the Parents' insistence on a MAST Academy setting was required for a FAPE.  That conclusion does not ipso facto mean, however, that the Board's decision to place him in one of the largest high schools in the system is likewise sustainable.  Given O.L.'s prior experience at Palmetto Middle School, his breakdown in December 2004, and the similarities in his behavior and symptoms prior to his breakdown and while he attended PSHS, the record convincingly demonstrates that O.L. will likely not be able to access his education and will not receive an educational benefit.  And equally unavailing is the Board's argument that O.L. may show no improvement even if he were re-placed at another school. That is perhaps true.  But unless that avenue is made available to O.L., the Board cannot

---

[18]Although he seemed to do well while attending four periods in school and two periods at home, because of O.L.'s deficiency in social skills, the ALJ agreed he needs to attend all of his classes at school, as opposed to having homebound instruction for some courses.  Thus, attending school "part-time" will not provide O.L. with an educational benefit or a FAPE.  [FO ¶¶ 31, 90, 93].

satisfy its statutory duty to provide a "basic floor of opportunity" that is "designed to provide educational benefit to the handicapped child." *Rowley,* 458 U.S. at 192.

It is not coincidental that the Board's placement of O.L. at PSHS was also procedurally flawed based upon the premature decision to place him there even before the IEP.[19]  That flawed procedure clearly led to a factually unsupportable decision that was not based on the IEP but, instead, based upon Board policies having nothing to do with O.L.'s special circumstances.  Even though the Board notes it placed O.L. in PSHS because it is his home school, a location it often considers first, and it believed his needs could be met there, the record shows that location cannot provide O.L. with an appropriate education.  Ample evidence exists in this record proving, by a preponderance of the evidence, that an educational setting of 3,600 students, as exists in PSHS, prevents O.L. from obtaining a FAPE.  [FO ¶¶ 19-26, 32, 34, 55, 89, 100, 158, 162, 168-171; Tr. 826: 12-16, 827:8-15, 1437:14-16; Gerhardt Dep. 209-22:5, 70:4-20; Gonzalez Dep. 28:14-30:9; Kaskel Dep. 26:22-25; 28:14-21; 48:7-49:1].  Given the unique circumstances and the context of this case, the record demonstrates that O.L. will likely again experience the type of symptoms similar to his December 2004 "breakdown" if his placement at PSHS stands undisturbed, which could have a potentially harmful effect on O.L. *See* 34 C.F.R. § 300.116(c)-(d).  Consequently, the evidence supports a finding that the forced implementation of the IEP at PSHS is not tailored to O.L.'s specific needs and prevents him from obtaining a FAPE.

We reiterate that the Board does not necessarily have to place O.L. at MAST Academy or a similar specialized school with less than 700 students, but at the same time it should not insist that a student with O.L.'s difficulties be placed at a mega-school solely because that is

---

[19]In section III.B.3., *see supra* at 41-45, the Court found that the Board violated the IDEA's procedural safeguards with regard to predetermination in the decision to place O.L. at PSHS even before the IEP was completed.

where he would have been placed had he not required any special considerations.  If all of the Board's high schools had 3,600 students, then perhaps the IDEA would not provide any alternative.  *See Rowley,* 458 U.S. at 189-90 (IDEA does not require school board to provide the best possible education possible regardless of available resources); *M.M.,* 437 F.3d at 1102-03 (IDEA does not grant well-intentioned parents right to specifically select best possible program).  But there is no record dispute that PSHS is one of the biggest high schools in the County, especially in that general area, and that there are high schools available with far less than 3,600 students.   To ignore the availability of those schools simply based upon bureaucratic Board policy is to ignore the unique requirements of the IDEA.  *See M.M.,* 437 F.3d at 1098 ("The reviewing court has broad discretion in determining what is appropriate based on the circumstances of each case.") (citing *Sch. Comm. of Town of Burlington v. Dep't of Educ.,* 471 U.S. 359, 370 (1985)); *see, e.g., Battle by Battle v. Commonwealth of Pa.,* 629 F.2d 269, 280 (3d Cir. 1980) (holding that inflexible policy of limiting special education to 180 days per year violated IDEA because such an across-the-board policy conflicted with "the Act's emphasis on the individual."); *see also Deal,* 392 F.3d at 859 (predetermined placement decision based on a "'one size fits all' approach to special education will not be countenanced by the IDEA.").

The required standard of review is significant in this respect.  Had the statute been drafted, as it perhaps should have, with a requirement that a Court only find that some competent evidence in the record supported the ALJ's decision, then the outcome here may have been different.  But the statute requires *de novo* review of the record, wherein only "due weight" must be given to certain ALJ findings but a court is free to accept or reject others. *Rowley,* 458 U.S. at 207; *Walker County,* 203 F.3d at 1297-98; *Loren F.,* 349 F.3d at 1314.  And a court must exercise its discretion where the appropriate level of deference is overcome by the

record evidence.  *See Jefferson County,* 853 F.2d at 857; *Walker County,* 203 F.3d at 1297-98.

Faced with that statutory obligation, the Court now has carefully reviewed this extensive

record and concluded that the record does not support the ALJ's decision to leave undisturbed

the Board's placement of O.L. at PSHS, especially when the evidence is so overwhelmingly in

the Parents' favor and the contrary evidence is meager, at best.  As noted earlier, the Board's

own professional witness recommended a placement altogether different than what the Board

or the ALJ determined.  Virtually all of the professional opinions in the record support the

view that, at least, PSHS is not a suitable placement for this handicapped child.  And the

record also shows that the ALJ never even rendered a finding that took into account O.L.'s

significant negative experience while at PSHS.  The Court is thus duty bound not to ignore

this disparity in the evidence, *especially* when the record also reveals a material procedural

flaw in the Board's original decision to place O.L. at PSHS.  *See, e.g., Mr. X v. New York State

Educ. Dep't,* 975 F. Supp. 546, 558 (S.D.N.Y. 1997) ("If the conclusions of the hearing and

review officers are 'unsupported by the record as a whole and incorrect as a matter of law, they

simply [do] not merit deference.'") (quoted citations omitted).

Accordingly, the Court finds that PSHS is not an appropriate setting for O.L.'s needs

and does not provide him with a FAPE.  The case must be remanded to the Board, for

procedural and substantive reasons, for it to once again review the appropriate school setting

and identify an alternative school placement that better takes into account O.L.'s condition

and the IEP.

### 3.   Least Restrictive Environment ("LRE")

Claiming the Board failed to place O.L. in the LRE, the Parents finally argue that O.L.

needs to be integrated with non-disabled peers in non-academic and extra curricular activities

to the maximum extent appropriate.  [Parents' Proposed Order, pp. 2, 17;  Parents' Response,

p. 18]. However, the Board asserts that the Parents did not include a LRE claim in either their complaint or their underlying due process complaint and, thus, the ALJ did not issue findings on this issue. [Board's Motion, DE 25, p. 18; Board's Consolidated Response, p. 19]. The Board asserts that the Parents have failed to exhaust administrative remedies and are precluded from raising a LRE claim now. [Board's Consolidated Response, p. 19].

While the Parents insist they filed a specific list of claims they desired to pursue in response to the Board's request for a due process hearing, of which a LRE claim was included, the Parents noted that the ALJ did not address the LRE issue. [Parents' Proposed Order, p. 17; Parents' Response, p. 18; Parents' Consolidated Reply, p. 3]. The Parents point to the fact the Board objected to such efforts, which the ALJ sustained, and thus, they claim to have exhausted all administrative remedies. *Id.* The Parents also point to the hearing transcripts, where upon their request for the ALJ to affirm they exhausted all administrative remedies, counsel for the Board stated: "We will not in any way, shape or form in the future say you did not exhaust administrative remedies, we will defend the case on other grounds, but not on that." [Parents' Consolidated Reply, pp. 3-4; Tr., 1084:16-22].

Although the Parents failed to specifically raise a LRE claim in their complaint to the ALJ, the Parents did state they sought to address "all of their issues pursuant to . . . 20 U.S.C. § 1400 *et seq.* . . . [and] 34 C.F.R. § 300.001 *et seq.*"[20] [DE 10, pp. 40-41 ¶¶ D.2.a., e.]. During the hearing, the Parents requested for the ALJ to make a finding on the LRE if it found that the IEP did not provide a FAPE. [Tr., 32:7-17; 34:1-35:16]. Nevertheless, unlike the instances above where the Court found that the Parents minimally exhausted their administrative remedies, the Parents here failed to raise any issue of a LRE in their opening statement and

_____

[20]Within 20 U.S.C. § 1400 is § 1412(a)(5) and within 34 C.F.R. § 300.001 are §§ 300.114(a)(2), 116(c)-(d), which relate to placement as a LRE.

did not specifically state that a LRE was an issue in their Proposed Final Order to the ALJ, although they did state the law and facts related to a LRE in a short paragraph within the document.  [Tr. 47:8-49:16 DE 10, p. 286].  Likewise, the Board only minutely mentioned a LRE in its opening statement, stating that the May IEP provided an educational benefit to O.L. in the LRE, and in its Proposed Final Order to the ALJ, asserting that O.L. was provided with a FAPE in the LRE.  [Tr., 46:9-14; DE 10, p. 206 ¶ 67].  Given this, along with the fact that the ALJ did not address the issue of a LRE and did not make a finding of fact, the Court finds that the Parents have not exhausted their administrative remedies on this issue.

Accordingly, the Court cannot review whether the Board failed to place O.L. in the LRE.

### IV.  CONCLUSION AND RECOMMENDATION

Based upon a thorough review of a lengthy administrative record measured against the requirements of the IDEA, the Court finds that, by a preponderance of the evidence, the Board complied with most, but not all, applicable statutory requirements.  The Court finds that the Board's decision to place O.L. only at Palmetto Senior High School violated the statute's required procedures and did not provide him with a free and appropriate education.  The matter should be remanded to the Board for further proceedings in accordance with this Court's decision that requires review of the appropriate school setting for O.L. and re-placement at a suitable institution that complies with the Court's Order.  Additionally, as the parties have agreed, the Court will schedule an evidentiary hearing at a later date on the remaining issues in the case with respect to compensatory damages and attorneys' fees.

In summary, we hereby **RECOMMEND** that the Parents' Proposed Order [DE 21] be **GRANTED IN PART** and **DENIED IN PART** and that the Board's Motion [DE 23, 24, 25] be **GRANTED IN PART** and **DENIED IN PART**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) business days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein.  *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE and SUBMITTED** in Chambers at Miami, Florida this 19th day of May, 2008.

EDWIN G. TORRES
United States Magistrate Judge